BENTON, J.,
dissenting.
I would reverse the jury’s convictions of Jaime Salvador Molina for rape and sodomy and dismiss the indictment be *371 cause the evidence was insufficient to prove the offenses. I also believe that the convictions were improperly rendered because the trial judge erred by limiting the testimony of an expert witness on an issue of critical significance to Molina’s defense and by improperly instructing the jury on three disjunctive theories of rape.
I.
At trial, the Commonwealth contended that Molina rendered the complaining witness unconscious by hitting her with some object, abducted her, and raped her. A jury instruction allowed the jury to convict Molina of rape under Code § 18.2-61(A) if he had sexual intercourse with the complaining witness “against her will and without her consent; and ... by force, threat or intimidation; or by the use of her mental incapacity or physical helplessness.” At the conclusion of the evidence, the trial judge found the evidence was insufficient to prove malicious wounding and abduction, and he struck those charges. I would hold that the evidence was also insufficient to support a conviction for rape. Even if we disregard Molina’s statement that the two had consensual sexual intercourse, what occurred after Molina and the complaining witness kissed, hugged, talked about sexual things, and went behind the store was mere conjecture and speculation based on inconclusive evidence.
Our review of the sufficiency of the evidence in this case is guided by a well-settled principle.
“[I]f the proof relied upon by the Commonwealth is wholly circumstantial, as it here is, then to establish guilt beyond a reasonable doubt all necessary circumstances proved must be consistent with guilt and inconsistent with innocence. They must overcome the presumption of innocence and exclude all reasonable conclusions inconsistent with that of guilt. To accomplish that, the chain of necessary circumstances must be unbroken and the evidence as a whole must satisfy the guarded judgment that both the corpus delicti and the criminal agency of the accused have been proved to *372 the exclusion of any other rational hypothesis and to a moral certainty....”
But, circumstances of suspicion, no matter how grave or strong, are not proof of guilt sufficient to support a verdict of guilty. The actual commission of the crime by the accused must be shown by evidence beyond a reasonable doubt to sustain his conviction.
Clodfelter v. Commonwealth, 218 Va. 619, 623, 238 S.E.2d 820, 822 (1977) (quoting LaPrade v. Commonwealth, 191 Va. 410, 418, 61 S.E.2d 313, 316 (1950)). This is so because, as a matter of constitutional law, the Due Process Clause protects an accused from conviction “except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.” In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). In other words, the evidence must exclude every reasonable hypothesis of innocence and, therefore, it is insufficient to support a conviction when it creates merely a suspicion or probability of guilt. Yarborough v. Commonwealth, 247 Va. 215, 218, 441 S.E.2d 342, 344 (1994); Burrows v. Commonwealth, 224 Va. 317, 320, 295 S.E.2d 893, 895 (1982); Hyde v. Commonwealth, 217 Va. 950, 954-55, 234 S.E.2d 74, 77-78 (1977).
The Commonwealth failed to prove an unbroken “chain of necessary circumstances” to establish Molina’s guilt to the exclusion of other hypotheses. According to the prosecutor’s theory, Molina hit the complaining witness on the head with some object, rendering her unconscious, then moved her behind a convenience store, raped her, and forcibly sodomized her. Yet, the complaining witness never testified that Molina did any of those things. The record contains ample evidence, including the complaining witness’ admissions, that she did not recall all the events that occurred after she met Molina. She has a bipolar disorder and could only recall that at some point she was unconscious from a seizure. She had a history of mixing prescription drugs, illegal drugs, and alcohol, and a history of similar seizures. Simply put, the evidence was insufficient to prove beyond a reasonable doubt the Commonwealth’s theories of forcible rape and sodomy.
*373 Significantly, the complaining witness gave conflicting testimony that was vague, malleable, and not specific as to the events that transpired. The complaining witness testified that she sat on a wall beside a convenience store at ten o’clock in the morning and drank the entire bottle of wine she had just purchased. A “brick column [was] right behind” her perch on the wall. After drinking the wine, the complaining witness drank milk and talked with Molina about her life. During this conversation, she and Molina engaged in mutual hugging and kissing. The following events are the extent of her direct testimony regarding what happened as she sat on the wall:
A: A gentleman approached me____He sat down next to me and started talking to me.
Q: Did you know who that person was?
A: No.
Q: Did you speak with him?
A: Yes.
Q: What happened after you spoke with him?
A: We spoke for awhile. The next thing I remember is my head being hit by something hard.
Q: Where were you when your head was hit by something hard?
A: Sitting on the bricks.
Q: Do you know who hit you in the head?
A: No.
On cross-examination, the complaining witness disclosed she was speculating about what actually occurred.
Q: ... You’re telling us that you don’t know how it was that you lost consciousness. Correct?
A: I was hit with something—
Q: But you never saw—
A: —or hit against something.
Q: You never saw anything hit you. Is that fair to say?
A: No.
*374 Q: And you never saw any person with anything that hit you. Right?
A: No.
She testified that she did not remember anything from that point until she awoke in the hospital. She also told the jury she does not know where she was when she lost consciousness. She acknowledged, however, that in the hospital shortly after the incident she gave another version.
Q: But you told the detectives at least once during one of your tape recorded statements that you remember banging your hand or your head while one person was there and then that person left.
Then another person came, and it was after that person came that you lost consciousness. Remember that?
A: That’s how it happened.
The complaining witness and her physician testified she has a bipolar disorder with both depressive and manic episodes. The complaining witness also admitted she was prone to seizures after using drugs and alcohol. These seizures resulted in periods when she would blackout, that is, when she had no memory of events. During a period in July (two months before the incident), the complaining witness was admitted to a psychiatric hospital for overdosing on Xanax, Oxycodone, Doxepine, Thorazine, and alcohol. Abundant evidence proved she had been misusing her prescription medications in the months prior to the morning she met Molina.
The complaining witness’ treating physician testified that she had a history of hypomania — “a state when there is decreased need for sleep and increased energy and physical energy.” She also testified that the complaining witness reported times when she had not slept over a period of several days. Although the complaining witness testified at trial that she was at home the night before the incident, she admitted to the officers who questioned her at the hospital that she had been in Washington, D.C., all night before the morning she went to the convenience store. That night, the complaining witness had ingested undisclosed quantities of “Xanax, Zana *375 flex, ... Lithium, Zoloft, Zethacoat(ph), and Nexium.”[9] She made these admissions only after the officers learned from her father that she had not returned home at night.
The evidence proved that in addition to those drugs she drank alcohol the day of this incident and suffered a seizure. Although her doctors had instructed her not to combine her prescription medications with alcohol, she testified that the morning after ingesting the drugs she purchased a bottle of wine at the store and drank all of it. Indeed, at different points in her testimony, she admits that she drank beer, a bottle of wine and/or a wine cooler. A blood test at the hospital revealed that the alcohol content in her blood was 292 mg/dL when measured. A textual footnote on the blood test report indicates a depression of the central nervous system when a reading is “greater than 100 mg/dL” and “fatalities reported: greater than 400 mg/dL.”
The complaining witness could not recall which drugs she took that morning before consuming the alcohol. She testified as follows:
The day of September 28th, I hadn’t taken anything. I don’t know if I had taken my regular medication or not, but if I had it was what was prescribed.
And I drank just the wine that I said I drank and had a seizure, so it was not just because of my pills or the alcohol.
The blood tests showed, however, that she tested positive for benzodiazepines, an opiate, and cocaine and that she had a much lower level of lithium in her body than normally prescribed for her diagnosis of bipolar disorder. In addition, the para-medical technician who examined her at the convenience store reported foam around her mouth, which was evidence of a seizure.
The complaining witness claimed to have suffered facial lacerations, broken bones in her face, and “some type of *376 injury” to her head that bled profusely. However, the paramedical technician, who testified that she is trained to accurately record any injuries and that she attended the complaining witness for a substantial length of time, told the jury she did not notice any injury other than some puffiness in the complaining witness’ face. The complaining witness also testified she told the police she may have sustained those injuries before going to the store that morning.
Moreover, the Commonwealth’s witnesses contradicted the complaining witness’ testimony in other significant aspects. A police officer who interviewed the complaining witness after she was examined in the hospital testified that the complaining witness was conscious and responsive and that she gave a different version of the events in the hospital. She told the officer that while she was sitting on the wall, she and the man talked “about sexual things.” She also said she walked away from the wall and struck her face on a tree. In addition, she told the officer she was conscious when she was having sexual intercourse.
The officer who interviewed the complaining witness also interviewed Molina. Molina said the complaining witness talked to him about her family and her life before saying she wanted to have sexual intercourse with him. They went to the rear of the store where “she laid down” and pulled him down upon her. He denied having anal intercourse with her. According to Molina, when they finished having sexual intercourse she said she wanted to stay there and sleep. He also said he left her, later returned, and then saw another man atop her.
A repetition of the complaining witness’ testimony graphically demonstrates that she told the detectives at the hospital a version of events that was consistent with Molina’s statement.
Q: But you told the detectives at least once during one of your tape recorded statements that you remember banging your hand or your head while one person was there and then that person left.
*377 Then another person came, and it was after that person came that you lost consciousness. Remember that?
A: That’s how it happened.
Indeed, when the police arrived behind the store, Molina was standing, fully clothed and another man was on the ground beside the complaining witness.
The evidence does not exclude the hypothesis that the complaining witness voluntarily went behind the store after hugging and kissing Molina and engaging in conversation about sexual activity. She consented to sexual intercourse with Molina, then had a seizure and lost consciousness after Molina left and before the other man arrived. Indeed, the trial judge found that the evidence was insufficient to prove Molina either wounded her or abducted her.
Simply put, the evidence, including the complaining witness’ own testimony, established she did not accurately remember the events that led to her having sexual intercourse because of her drug and alcohol abuse and the effects of those substances on her bipolar disorder.
Q: You’ve just told us that you have a history of having seizures. Right?
A: It happens.
Q: You’ve told us that you have a history of when you drink, you don’t remember things sometimes.
A: Yes.
Q: And you told us that when you take pills you don’t remember things some times?
A: Yes.
Q: You told us you have a history of taking too many drugs. Right?
A: Yes.
Q: Too much alcohol?
A: Yes.
Q: The detectives were asking you questions [the same day of the incident] and you were having trouble remember *378 ing some of the things that supposedly happened that day. Right?
A: At the time they were asking me questions, yes.
Q: ... [W]ould it be fair to say that when you were speaking with the detectives there were various points where they would ask you questions about what happened and you would have a problem recalling what had happened, and you couldn’t answer.
A: Yes.
Q: The same problem you’ve had today?
A: Yes.
Q: The same problem you had at the preliminary hearing?
A: Yes.
At the close of the evidence, the Commonwealth argued to the jury that the complaining witness “was beaten that day, that she was beaten to the point where she was unconscious and that she was raped and sodomized.” Yet, the Commonwealth failed to disprove the reasonable hypothesis, supported by the evidence, that the complaining witness consented to sexual intercourse with Molina and that, as a result of later “blacking out” from the effect of drugs and alcohol on her bipolar disorder, she had no accurate memory of the events. The complaining witness did not testify that Molina hit her on the head or otherwise used force, threat or intimidation when interacting with her; she specifically testified that Molina never made any threats toward her. Indeed, at trial she said she “was hit with something ... or hit against something,” but did not attribute this to Molina. The jury was left to speculate about what occurred because the Commonwealth presented no physical evidence showing forcible penetration and provided no coherent chain of events showing that Molina raped the complaining witness. The complaining witness kissed and hugged Molina and talked “about sexual things” before having sexual intercourse with him. The evidence left the jury to speculate when, during the events behind the store, the complaining witness became unconscious. Though she *379 testified at trial that she did not remember having sexual intercourse, she told the officers in the hospital the day of the event that she was conscious while having sexual intercourse. Thus, I would hold that no evidence proved Molina acted against her will and no evidence proved forcible penetration.
I believe the jury was misled by an instruction that the Commonwealth offered which provided in the disjunctive two additional theories under Code § 18.2-61 to convict of rape: that the rape was accomplished through the complaining witness’ physical helplessness or that the rape was accomplished through the complaining witness’ mental incapacity. No evidence proved the complaining witness suffered from physical helplessness or from mental incapacity when she engaged in sexual intercourse with Molina.
With regard to proof of physical helplessness in a rape charge, we have made an important distinction between being physically unable to communicate at the time of the intercourse and physically unable to communicate afterward. Howard v. Commonwealth, 21 Va.App. 473, 465 S.E.2d 142 (1995). In Howard, the complaining witness lost consciousness shortly after having intercourse. Id. at 476, 465 S.E.2d at 143. We explained as follows:
The Commonwealth asserts that the trial court reasonably could have inferred physical helplessness from the fact the victim went to a neighbor’s apartment shortly after the alleged incident, partially clothed, before vomiting and collapsing. The Commonwealth highlights the fact that the victim could not recognize her parents for a period of hours and passed in and out of consciousness after being taken to the hospital, where doctors determined she was intoxicated. However, assuming the victim was intoxicated to the point of being physically unable to communicate at the time she exited the apartment, this does not prove she was intoxicated to the same degree when she engaged in sexual intercourse with appellant. Even in conjunction with other evidence, the Commonwealth’s case was not strong enough to prove appellant’s guilt beyond a reasonable doubt. In so holding, we find the following admonition appropriate: *380 “[t]he conduct of [appellant] cannot be condoned. It was disgraceful. It was enough to shame one steeped in moral infamy. But he was not tried for that. Rape was the charge laid at his door and the Commonwealth’s evidence fail[ed] to sustain it.”
Id. at 480-81, 465 S.E.2d at 145-46 (citations omitted).
In this case, the Commonwealth argued to the jury that the complaining witness “was beaten to the point where she was unconscious and [then] ... raped and ... sodomized.” No evidence proved Molina beat her or assisted in beating her. Significantly, the trial judge found that the evidence failed to prove malicious wounding and struck that charge. In the absence of evidence, the jury had to speculate to conclude that the complaining witness was physically helpless when she was having intercourse. She admitted to the detectives that she was conscious while having sexual intercourse. By her own admission, when she mixed alcohol and her prescribed medication, she was prone to seizures and to blackouts that caused her to be unable to remember events. She testified that on the day at issue, she drank wine, took drugs whose names she could not recall, and had a seizure. The evidence failed to disprove that her use of drugs and alcohol caused her failure to remember and that her lapse into unconsciousness occurred after she had sexual intercourse with Molina.
The Commonwealth never argued at trial that the complaining witness was mentally incapacitated. “Mental incapacity” is a statutory term that does not connote the ordinary meaning; it is defined as “that condition of the complaining witness existing at the time of an offense under this article which prevents the complaining witness from understanding the nature or consequences of the sexual act involved in such offense and about which the accused knew or should have known.” Code § 18.2-67.10(8). As we explained, in Adkins v. Commonwealth, 20 Va.App. 332, 342-43, 457 S.E.2d 382, 387 (1995), the statute exists “to protect persons who are mentally impaired or retarded from being sexually exploited due to their mental incapacity.” A person is mentally incapacitated only when “he or she has a mental ‘condition’ that ‘prevents’ *381 the person from being able to ‘understand’ either the ‘nature’ or ‘consequences’ of engaging in sexual intercourse.” Id. at 344-45, 457 S.E.2d at 387. Thus, we explained as follows:
To “know, apprehend, or appreciate” the “nature and consequences” of sexual intercourse can range from a simple understanding of how the act of coitus is physically accomplished together with an understanding that a sensation of pleasure may accompany the act, to a thorough and comprehensive understanding of the complex psychological and physiological “nature” of “the sexual act involved” and that, aside from immediate gratification, the act may have dire familial, social, medical, physical, economic, or spiritual consequences.
Id. In other words, to obtain a conviction under the statute, “the Commonwealth must prove ... that the person does not understand ‘the nature and consequences of the sexual act involved.’ ” Id. at 343, 457 S.E.2d at 387. See also White v. Commonwealth, 23 Va.App. 593, 597, 478 S.E.2d 713, 715 (1996).
The Commonwealth’s argument to the jury during opening and closing arguments is devoid of any suggestion that Molina accomplished the rape or sodomy through the use of the complaining witness’ mental incapacity. Indeed, the Commonwealth never offered evidence to establish that the complaining witness was not able to understand the nature and consequences of sexual intercourse within the meaning of Code § 18.2-61(A). The Commonwealth’s own witness testified that the complaining witness said she was kissing and hugging Molina and discussing “sexual things.” Furthermore, no evidence proved Molina knew or should have known the complaining witness was not comprehending the nature of the sexual acts. Thus, the jury could not find beyond a reasonable doubt mental incapacity because no evidence in the record supported such a finding.
Simply, the complaining witness testified she was unable to recall what occurred. Beyond the presence of Molina’s semen, which equally supported the hypothesis that the sex was *382 consensual, there was no physical evidence of rape. If one disregards Molina’s testimony that the two had consensual sex, what occurred when Molina and the complaining witness went behind the store could only be discerned by conjecture and speculation. Conviction on this circumstantial evidence that raises only suspicion and speculation is precisely what Clodfelter prohibits. 218 Va. at 623-24, 238 S.E.2d at 822. “ ‘Suspicion ... no matter how strong is insufficient to sustain a criminal conviction.’ ” Commonwealth v. Smith, 259 Va. 780, 784, 529 S.E.2d 78, 79 (2000) (quoting Stover v. Commonwealth, 222 Va. 618, 624, 283 S.E.2d 194, 197 (1981)).
II.
For these same reasons, I would reverse the conviction for sodomy. The indictment alleged that anal intercourse occurred and was committed “by force, threat or intimidation.” However, no evidence proved penetration of the anal cavity occurred. A nurse who interviewed and examined the complaining witness at the hospital found only minor abrasions in the genital rectal area that were not visible to the naked eye. The nurse’s written report required her “to check off a box under anal contact” and listed the options “yes, no, attempt, or unknown.” The nurse checked “no.” Iri contrast, she checked “yes” for “vaginal contact” and notes “penis.” This report is consistent with Molina’s admission that they engaged in vaginal intercourse but not anal intercourse.
The evidence merely established that a rectal anal swab revealed the presence of Molina’s DNA; however, the evidence also established that semen can be transferred to various body parts during the act of sexual intercourse. The jury had to speculate that anal intercourse occurred between Molina and the complaining witness. A verdict “based only upon speculation and conjecture ... cannot be permitted to stand.” Dunn v. Commonwealth, 222 Va. 704, 706, 284 S.E.2d 792, 793 (1981).
III.
I would hold that the trial judge’s limitation on Dr. William Alexander Morton’s testimony was reversible error. Molina’s *383 defense was that the complaining witness had consented to the sexual intercourse. He was prepared to offer the testimony of an expert concerning the behavioral effects of prescription drugs, illegal drugs, and alcohol on a person with a bipolar disorder. Molina’s attorney proffered that Dr. Morton has a PhD in pharmacy, is a professor of pharmacy, and is an assistant professor of psychiatry in behavioral science. Dr. Morton would have explained how the complaining witness “could appear to be lucid, impulsive, and gregarious,” yet be unable to remember her behavior.
The trial judge limited Dr. Morton’s testimony to the effects of alcohol and drugs without reference to bipolar disorder, ruling that Dr. Morton is not a “medical doctor” and, thus, could not refer to the complaining witness’ bipolar disorder. This was reversible error. The record proved that Dr. Morton is an expert in the field of “psychopharmacology, which is [the study of] how drugs affect the brain.”
The sole purpose of permitting expert testimony is to assist the trier of fact to understand the evidence presented or to determine a fact in issue. Generally, a witness is qualified to testify as an expert when the witness possesses sufficient knowledge, skill, or experience to make the witness competent to testify as an expert on the subject matter at issue. Sami v. Varn, 260 Va. 280, 284, 535 S.E.2d 172, 174 (2000); Noll v. Rahal, 219 Va. 795, 800, 250 S.E.2d 741, 744 (1979). “An expert’s testimony is admissible not only when scientific knowledge is required, but when experience and observation ... give the expert knowledge of a subject beyond that of persons of common intelligence and ordinary experience. The scope of such evidence extends to any subject in respect of which one may derive special knowledge by experience, when [the witness’s] knowledge of the matter in relation to which [the witness’s] opinion is asked is such, or is so great, that it will probably aid the trier [of fact] in the search for the truth.” Neblett v. Hunter, 207 Va. 335, 339-40, 150 S.E.2d 115, 118 (1966); cf. Code § 8.01-401.3. In essence, all that is necessary for a witness to qualify as an expert is that the witness have sufficient *384 knowledge of the subject to give value to the witness’s opinion. Norfolk & Western Railway Co. v. Anderson, 207 Va. 567, 571, 151 S.E.2d 628, 631 (1966).
Velazquez v. Commonwealth, 263 Va. 95, 103, 557 S.E.2d 213, 218 (2002).
The record proved that Dr. Morton’s specialized field is psychopharmacology, and he studies the effects of prescription and illegal drugs, as well as alcohol, on thinking and behavior. He is not, as the trial judge seemed to insist, merely “a pharmacist.” He has extensive experience in treating, evaluating, and studying the effects of drugs and alcohol on behavior. He is a professor of pharmacy and assistant professor of psychiatry in behavioral science at the University of South Carolina. In that setting, he “work[s] with psychiatrists and other pharmacy students, medical students, instructing them what to expect from various drug therapies.” He is board certified in the “fairly specialized” area of psychiatric pharmacy practice. At the time of the trial, he was working in a general and psychiatric clinical practice where patients undergo drug and alcohol treatment in an “in patient unit.” In addition to his extensive experience in the field generally, Dr. Morton has studied and dealt specifically with the effects of lithium on persons diagnosed with bipolar disorder. He has written numerous publications (forty-six) in the field of lithium and bipolar disorder, “looking at how to monitor and utilize lithium and ... in the area of treatment of bipolar disorder, as well as ... other areas of psychopharmacology.” He has established several lithium climes, one of which was specifically for persons with bipolar disorder, and, for eighteen years, he worked in clinics where he saw from 200 to 280 patients on a regular basis. He worked as a consultant on a regular basis for drug and alcohol programs, and he was a regular faculty member in a setting where he saw patients and made recommendations on their drug therapies. In his practice, he consulted with physicians who needed to ascertain if and what kind and dosage of drugs a patient should take. In certain cases, he was the primary care practitioner for patients who had been diagnosed with bipolar disorder.
*385 The Supreme Court has unequivocally held, “we will reverse a holding that a witness is not qualified to testify as an expert when it appears clearly from the record that the witness possesses sufficient knowledge, skill, or experience to make him competent to testify as an expert on the subject matter at issue.” Sami, 260 Va. at 284, 535 S.E.2d at 174. The record proves that Dr. Morton was qualified to give an opinion about the effects of drugs and alcohol on a bipolar person who combined alcohol with drugs. Other experts and the complaining witness’ own testimony established that she suffered from a bipolar disorder and that she had taken lithium, other prescription drugs in unprescribed overdoses, illegal substances, and alcohol. Dr. Morton’s breadth of experience, which included lengthy and extensive clinical experience, treatment of patients, and knowledge of the effects of prescription and illegal drugs on the behavior of individuals diagnosed with bipolar disorder, satisfied the requirements for expert testimony.
The trial judge erred by requiring that Dr. Morton be a medical doctor to testify as to the effect of drugs and alcohol on persons with a bipolar disorder. As Molina correctly notes, the Supreme Court has allowed a nurse to testify about the causation of physical injuries of rape victims, even though a nurse is not a licensed physician, because “it has long been accepted that nurses and other healthcare professionals with the proper training, expertise, and experience are qualified to give expert opinions on medical causation in appropriate circumstances.” Velazquez, 263 Va. at 103-04, 557 S.E.2d at 218. Dr. Morton is an expert in the field in which he was called to testify, psychopharmacology.
This error was not harmless. Dr. Morton’s expertise included evaluating the effects of a number of illicit and prescribed drugs, in varying amounts, and alcohol on the behavior of persons with bipolar disorder. His testimony was critical to Molina’s defense. Dr. Morton’s testimony about the effects of alcohol, cocaine, and other substances on the complaining witness’ bipolar disorder would have allowed the jury to infer that she could have appeared quite normal (and consenting) to *386 Molina, yet have no memory of engaging in sexual intercourse. The exclusion of his testimony left the jury uninformed about the effect of the combination of the drugs and alcohol on the behavioral pattern and memory of a bipolar person whose lithium level was abnormally low. This was a matter beyond the understanding of lay persons. By excluding the testimony, the trial judge deprived Molina of evidence of a factual basis upon which the jury could have decided in Molina’s favor.
IV.
I would also hold that the trial judge erred in granting Instruction 14, which reads as follows:
The Court instructs the jury that the defendant is charged with the crime of rape. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
(1) That the defendant had sexual intercourse with [the victim] who was not then the defendant’s spouse; and
(2) That it was against her will and without her consent; and
(3) That it was by force, threat, or intimidation; or by the use of mental incapacity or physical helplessness.
If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the offense as charged, then you shall find the defendant guilty....
This instruction erroneously combined the elements of “against her will and without her consent” with the elements of “mental incapacity or physical helplessness” in a way not contemplated by the rape statute. In pertinent part, Code § 18.2-61(A) provides as follows:
If any person has sexual intercourse with a complaining witness ... and such act is accomplished (i) against the complaining witness’s will, by force, threat or intimidation of or against the complaining witness ... or (ii) through the *387 use of the complaining witness’s mental incapacity or physical helplessness ... he or she shall be guilty of rape.
Thus, the statute defines three distinct circumstances of sexual intercourse: (i) against a person’s will by force (or threat or intimidation), (ii) through the use of the person’s mental incapacity, and (iii) through the use of the person’s physical helplessness.
The jury asked questions that reasonably suggested that the melding of these elements in one instruction created confusion. For example, the jury wrote to the judge the following inquiry:
Assumption: The defendant and the victim could be in the same mentally incapacitated state at the time of the incident.
Issue:
(1) Based on the assumption, does Virginia Law specify whether a defendant would be expected to render a rational decision as to the state of mental capacitation and incapacitation of the woman whom he desires to engage in a sexual act?
(2) Per se, are two adults, one male and one female, that are mentally incapacitated at the time of the sexual encounter engaged in an act of “rape”?
These inquiries are significant because the instructions the trial judge gave to the jury did not require the jury to find that the complaining witness was either mentally incapacitated or physically incapacitated. The Commonwealth offered, and the judge gave, an instruction that permitted the jury to convict Molina upon a finding of Molina’s “use of mental incapacity.” Significantly, the Commonwealth never argued that the complaining witness was mentally incapacitated. In other words, the jury could have found that the complaining witness was intoxicated and that Molina, who was also intoxicated, was guilty of rape because he engaged in sexual relations with her without the use of force, threat, or intimidation, but at a time when he was mentally unable to comprehend her intentions. The jury gave an indication it was considering this *388 when it inquired whether “the defendant and the victim could be in the same mentally incapacitated state at the time of the incident.” It is certain that “the same ... state” the jury addressed was intoxication because it is undisputed that the evidence proved both Molina and the complaining witness were similar in this respect — they both consumed alcohol at “the time of the incident.”
We have held that a complaining witness is not rendered physically helpless or mentally incapacitated solely because “she was ‘drunk’ ... [and] was taking ‘antidepressant’ medication that day.” Howard, 21 Va.App. at 476, 465 S.E.2d at 143. Yet, the instruction in this case permitted the jury to substitute for the “force, threat or intimidation” element its belief that the complaining witness’ will was overcome merely because she was voluntarily intoxicated. Indeed, the jury, which specifically had indicated to the trial judge its lack of unanimity, asked: “Can you define ‘against her will?’ Consent is defined ... but “will’ is not.” The jury’s focus on the issue of complainant’s “will” is also evident by its further inquiry:
Element (8): “That it was against her will; and”
Issue:
(1) Under Virginia law, does Element (8) mean that the victim was or could be in a mental state that could prevent her from rendering a rational decision as to her will?
(2) Under Virginia law, does the act of exercising one’s “will” directly involves or implies a process of decision making?
The jury’s focus on the complaining witness’ consent and will was compromised by the instruction’s disjunctive use of three distinct circumstances of sexual intercourse. I disagree with the majority opinion’s conclusion that the instruction, which intertwined the three theories of rape, was harmless. The Commonwealth never argued that the complaining witness was mentally incapacitated. Yet, the instruction placed before the jury a basis upon which to impermissibly use the complaining witness’ intoxication. Furthermore, as the instruction is crafted, it is impossible to determine whether the *389 jury was unanimous on any one of the instruction’s theories of the event. Fewer than twelve jurors could have believed the complaining witness was raped by threat, force, or intimidation (a theory that was submitted to the jury even though the trial judge struck the wounding and abduction charges). Others could have believed that the complaining witness was conscious during intercourse (as she told the officers) and that the rape was accomplished while she was intoxicated (that is, according to the jurors’ inquiry, “in the same mentally incapacitated state” as Molina). Others could have found that the complaining witness’ intoxication equated with mental incapacity or physical helplessness. It is not possible to tell which set of facts the jury agreed on.
“Under established Virginia law, the verdict in all criminal prosecutions must be unanimous.” Evans v. Commonwealth, 228 Va. 468, 481, 323 S.E.2d 114, 121 (1984) (citing Rule 3A:17(a)). The requirement of unanimity means that the jury must unanimously find each element exists. See Richardson v. United States, 526 U.S. 813, 817-18, 119 S.Ct. 1707, 1710, 143 L.Ed.2d 985 (1999).
The Supreme Court explained in Richardson that, for example, the jury must unanimously find force as an element of the crime of robbery, but whether the force is created by the use of a gun or a knife is not an element of the crime and therefore does not require jury unanimity.
Jackson v. Commonwealth, 266 Va. 423, 434-35, 587 S.E.2d 532, 541 (2003) (citing Richardson, 526 U.S. at 817, 119 S.Ct. at 1710). In this case, however, the question is not “which of several possible sets of underlying brute facts make up a particular element.” Richardson, 526 U.S. at 817, 119 S.Ct. at 1710. Rather, this is a case where the elements of “against [a person’s] will” or “through ... mental incapacity” or “through ... physical helplessness” are three conceptually distinguishable concepts that are independent elements of the same crime. Because the jury had a menu of permissible ways to convict, the verdict failed to show that the jury reached unanimity on one set of facts. Thus, the Commonwealth failed to prove “every fact necessary to constitute the crime with *390 which he is charged.” In re Winskip, 897 U.S. at 364, 90 S.Ct. at 1073 (emphasis added). We have no basis to know from the record what essential element the jury found. Therefore, I would hold that the instruction was erroneous, failed to properly inform the jury of the law, and was not harmless.
For all of these reasons, I would reverse the convictions.

. It is likely that "Zethacoat(ph)” refers to Depakote, a drug used to treat mania associated with bipolar disorder and to treat seizure disorders.