COURT OF APPEALS OF VIRGINIA

Present:  Judges Barrow[*], Coleman and Senior Judge Hodges
Argued at Salem, Virginia


ROBERT VINCENT ADKINS

v.          Record No. 1862-93-3                 OPINION BY
                                          JUDGE SAM W. COLEMAN III
COMMONWEALTH OF VIRGINIA                        MAY 16, 1995


            FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
                       James F. Ingram, Judge

            Lawrence D. Gott (Office of the Public Defender,
            on brief), for appellant.

            Leah A. Darron, Assistant Attorney General
            (James S. Gilmore, III, Attorney General,
            on brief), for appellee.



     Robert Adkins was convicted, in a bench trial, of rape for
having had sexual intercourse with a person, not his spouse,
through the use of her mental incapacity in violation of
Code § 18.2-61(A)(ii).  The trial judge sentenced Adkins to
twenty years in the penitentiary.

     On appeal, Adkins contends that the trial judge erred by
admitting evidence of a doctor's "opinion" as to the victim's IQ.
 He argues that the doctor should not have been permitted to give
an opinion because it was not based on IQ test results that had
been admitted into evidence or upon tests administered by him.
Adkins further contends that the evidence is insufficient to
support a conviction for rape under Code § 18.2-61(A)(ii).  We

_____
     [*] Judge Bernard G. Barrow participated in the hearing and
decision of this case and joined in the opinion prior to his
death.

hold that the trial court did not err by permitting the doctor to testify concerning the complaining witness's IQ. However, because the Commonwealth's evidence failed to prove that the defendant had sexual intercourse with the victim "through the use of [her] mental incapacity," we reverse the conviction.

We will refer to the victim as Teresa. At the time of the charged offense, Teresa was sixteen years old and lived with her parents in Danville. She was in the eighth grade in the Danville public school system. Doctors at the Medical College of Virginia had diagnosed Teresa, at age three, as being mentally retarded. Over the ensuing years, her IQ test scores had ranged between fifty-eight and seventy.

Prior to the date of the charged offense, Teresa had met Adkins at a local mall. When they met, Teresa exchanged telephone numbers with him. She recorded his telephone number in an address book that she kept.

At the time of the charged offense, Adkins was twenty-seven years old and lived in an apartment with his father. According to the testimony of Adkins' sister, she received his social security check because he is not capable of handling his own money.

One day before the charged offense, Teresa's mother heard Teresa talking with Adkins on the telephone. The mother took the telephone from Teresa and told Adkins, "Teresa is mentally retarded. Leave her alone."

On the day of the charged offense, Teresa's mother went shopping, leaving Teresa at home. Teresa knew that her mother did not want her to talk with or to see Adkins. Nevertheless, Teresa called Adkins and asked him to pick her up at a mini-market near her home. She left a note telling her mother that she had gone to the mini-market. Adkins met Teresa, and they went to the apartment where he and his father lived. At the apartment, they watched television, had sexual intercourse, ate dinner, had intercourse a second time, and then fell asleep.

When Teresa's mother returned and could not locate Teresa, she notified the Danville police. Based upon information from Teresa's parents, the Danville police found Teresa and Adkins late that evening, hiding in his apartment. Teresa said she was hiding because she did not want to go home. Later, Adkins signed a written statement admitting that he had had sexual intercourse with Teresa.

At trial, Teresa's mother testified that Teresa is mentally retarded, but that she knows how to take care of herself, how to call 911, and how to go shopping. The mother testified that she had explained to Teresa the consequences of having sexual intercourse and that Teresa at least partially understood these discussions.

Teresa testified that when she first met Adkins at the mall, she did so on her own initiative, at which time she gave him her telephone number. She testified that she knew her mother did not

want her to see Adkins, but she did so anyway. She testified that on the day of the charged offense, she called Adkins with the idea of having sex with him, and she asked him to meet her.

Teresa testified that while at Adkins' apartment, she "made love" with him twice. She said it was "mostly" her idea to have sex, and she told Adkins that she was eighteen. When asked about the consequences of having sexual intercourse, she testified, "you could catch AIDS" and "you get pregnant."

James Pickens Culbert, PhD, a licensed clinical psychologist, was qualified as an expert witness. He testified that he had treated Teresa since she was seven years old, during which time he had tested her mental capacity and intellectual development. Based on IQ tests that had been administered to Teresa by Dr. Culbert's assistants, he testified that Teresa's IQ was fifty-nine, that her mental age was 10.4 years, and that her IQ range was determined to be between fifty-eight and seventy. Adkins objected to Dr. Culbert's testimony on the ground that he was giving an expert opinion that was not based on facts or test results admitted in evidence or that were personally known to Dr. Culbert. Adkins did not testify.

## I. EXPERT OPINION EVIDENCE

For this opinion, we accept the parties' contention that Dr. Culbert's testimony as to Teresa's IQ is an expert's opinion. Because Dr. Culbert's opinion as to Teresa's IQ was based upon his personal knowledge of Teresa as her long-time treating

psychologist and because his knowledge of the test results was based upon tests administered by persons directly under his supervision and control, we hold that Dr. Culbert's opinion as to Teresa's IQ was admissible.

The Commonwealth bore the burden of proving beyond a reasonable doubt that Adkins had sexual intercourse with Teresa "through the use of [her] mental incapacity." Code § 18.2-61(A)(ii). In an effort to prove that Teresa was mentally incapacitated, the Commonwealth introduced the testimony of Dr. Culbert, who had treated and tested Teresa since childhood concerning her mental and intellectual functioning.

Code § 8.01-401.1 provides:
> In any civil action any expert witness may give testimony and render an opinion or draw inferences from facts, circumstances or data made known to or perceived by such witness at or before the hearing or trial during which he is called upon to testify. The facts, circumstances or data relied upon by such witness in forming an opinion or drawing inferences, if of a type normally relied upon by others in the particular field of expertise in forming opinions and drawing inferences, need not be admissible in evidence.

Cf. Fed. R. Evid. 703 and 705. In criminal cases, however, the Supreme Court has expressly refused to adopt such a broad rule of admissibility for expert testimony. See Simpson v. Commonwealth, 227 Va. 557, 566, 318 S.E.2d 386, 391-92 (1984).

The Court said in Simpson:
> The General Assembly, in 1982, enacted Code § 8.01-401.1 which essentially adopts the foregoing provisions [Rules 703 and 705]

> of the Federal Rules of Evidence.  That
> statute's application is expressly limited to
> "any civil action."  We regard this
> limitation as a clear expression of
> legislative intent to retain the historic
> restrictions upon expert testimony in
> criminal cases in Virginia.

Simpson, 227 Va. at 566, 318 S.E.2d at 391 (citation omitted).
The traditional rule for admissibility of opinion evidence, which
continues to apply in criminal cases, is that "[a]n expert may
give an opinion based upon his own knowledge of facts disclosed
in his testimony or he may give an opinion based upon facts in
evidence assumed in a hypothetical question."  Walrod v.
Matthews, 210 Va. 382, 388, 171 S.E.2d 180, 185 (1969).

Adkins contends that, by applying the foregoing standard to
Dr. Culbert's opinion as to Teresa's IQ, the opinion was
inadmissible.  Adkins posits that the underlying tests
administered to Teresa which provided Dr. Culbert with the
results to formulate his opinion were not personally administered
by the doctor and, therefore, were not "based upon his own
knowledge of facts," and the test results had not been admitted
into evidence.  We disagree with the defendant's contentions as
to what is required in order for facts to be within the personal
knowledge of an expert witness.

Dr. Culbert testified that Teresa had been his patient since
she was seven years old.  He had examined her on five occasions—
at ages seven, ten, eleven, thirteen, and fifteen.  The purpose
of the examinations was to determine Teresa's intellectual

functioning.  Dr. Culbert testified that on those occasions, his assistants administered intellectual functioning tests to Teresa, and they provided him with the results and test scores.  He then conducted an independent examination of Teresa, including a personal interview with her and her parents.  Thereafter, Dr. Culbert applied to the test results and the facts personally known to him about Teresa accepted and established procedures and standards in the field for determining Teresa's intellectual functioning.  Based upon those standards, Dr. Culbert gave his opinion as to Teresa's IQ and relative mental age.  His opinion was based upon his personal knowledge of the test results and upon facts that he knew personally about Teresa.

Unlike the situations in Toro v. City of Norfolk, 14 Va. App. 244, 416 S.E.2d 29 (1992), and Mead v. Belcher, 212 Va. 796, 188 S.E.2d 211 (1972), relied upon by Adkins, where test results and procedures were neither in evidence nor personally known to the witness, the tests administered to Teresa were under Dr. Culbert's direct supervision and control.  He had personal knowledge of or access to the specific testing procedures that had been used, and he knew how the results were determined and how he had used them to formulate his opinion.  From this knowledge, Adkins could have effectively cross-examined Dr. Culbert and could have required him to explain how he formed an opinion as to Teresa's IQ and mental age.

The admissibility of expert witness evidence is within the

sound discretion of the trial court, and the decision will not be disturbed on appeal unless the trial court has clearly abused its discretion. Thorpe v. Commonwealth, 223 Va. 609, 614, 292 S.E.2d 323, 326 (1982). The trial judge did not abuse his discretion by admitting Dr. Culbert's opinion as to Teresa's IQ and mental age; therefore, we affirm the trial court's ruling.

## II. SUFFICIENCY OF EVIDENCE

When the sufficiency of the evidence is challenged on appeal, "it is our duty to consider [the evidence] in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom." Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). The trial court's judgment will not be reversed unless it is plainly wrong or without evidence to support it. Code § 8.01-680; Feigley v. Commonwealth, 16 Va. App. 717, 722, 432 S.E.2d 520, 524 (1993).

Code § 18.2-61(A) provides that "[i]f any person has sexual intercourse with a complaining witness who is not his or her spouse . . . and such act is accomplished . . . (ii) through the use of the complaining witness's mental incapacity . . . he or she shall be guilty of rape." (emphasis added). "Mental incapacity" is defined as "that condition of the complaining witness existing at the time of an offense under this article which prevents the complaining witness from understanding the nature or consequences of the sexual act involved in such offense

and about which the accused knew or should have known."
Code § 18.2-67.10 (emphasis added).

The elements necessary to constitute a crime are generally to be gathered from the definition of the crime. Commonwealth v. Callaghan, 4 Va. (2 Va. Cas.) 460, 462 (1825). The Commonwealth has the burden of proving beyond a reasonable doubt each and every element of the charged crime. Powers v. Commonwealth, 211 Va. 386, 388, 177 S.E.2d 628, 629 (1970).

Adkins concedes that the evidence proved beyond a reasonable doubt that he had sexual intercourse with Teresa, who was not his spouse. However, the critical question is whether the evidence proved that he "accomplished" the act of sexual intercourse with her "through the use of" her "mental incapacity." His argument is twofold: first, he contends that "mental incapacity," for purposes of Code § 18.2-61(A)(ii), has a more particularized meaning than diminished mental capacity in general, requiring the Commonwealth to prove specifically that the victim did not understand the nature and consequences of sexual intercourse; second, he contends that the Commonwealth must prove that he in some way used or took advantage of Teresa's mental incapacity in order to "accomplish" the act of sexual intercourse with her.

The legislative purpose of Code § 18.2-61(A)(ii) is to protect persons who are mentally impaired or retarded from being sexually exploited due to their mental incapacity. See State v. Ortega-Martinez, 881 P.2d 231, 236 (Wash. 1994) (explaining the

-9-

legislative purpose of a similar statute).  However, such statutes must not be interpreted and applied in a manner that creates an unintended rule that would prohibit all mentally impaired or retarded persons from engaging in consensual sexual intercourse without having their partners commit a felony.[1]  See State v. Olivio, 589 A.2d 597, 604 (N.J. 1991) (expressing concern about "unenlightened attitudes toward mental impairment and about the importance of according the mentally handicapped their fundamental rights").  By specifically defining mental incapacity, the legislature has chosen to protect those mentally deficient persons whose mental condition prevents them from "understanding the nature and consequences of the sexual act involved."  Code § 18.2-67.10(3).

Thus, in order to convict a person of violating Code § 18.2-61(A)(ii), the Commonwealth must prove that the victim was "mentally incapacitated" as defined in Code § 18.2-67.10(3), which means that the person does not understand "the nature and consequences of the sexual act involved."

Some jurisdictions have interpreted and applied similar statutory requirements narrowly by requiring the state to prove that the victim was incapable of comprehending the "distinctively

---

[1] Although not a felony, consensual sexual intercourse between adults who do not have a "mental incapacity" as defined by Code § 18.2-67.10(3) is fornication, a Class 4 misdemeanor, Code § 18.2-344, a conviction for which is punishable by a fine of not more than $250.

sexual nature of the conduct." See Olivio, 589 A.2d at 599. See also K.H. Carson, Rape or Similar Offense Based on Intercourse With Woman Who Is Allegedly Mentally Deficient, 31 A.L.R. 3d 1227 (1970) (discussing the treatment of mental incapacity in similar rape statutes). Other jurisdictions have interpreted similar statutes more broadly, requiring the state to prove only that the victim did not understand the physiological, social, and moral ramifications of his or her actions. See People v. Easley, 364 N.E.2d 1328, 1332 (N.Y. 1977) (stating that being able to "appraise" the nature of conduct means an "appreciation of how it will be regarded in the framework of the societal environment and taboos to which a person will be exposed"). See also People v. McMullen, 414 N.E.2d 214, 217 (Ill. App. Ct. 4th 1980) (stating that the victim was unable to understand how "illicit sexual activity is regarded by other people").

While the interpretations that other jurisdictions have given similar statutes are instructive, they are not controlling. Code § 18.2-61(A)(ii) does not leave solely to judicial interpretation the defined class of persons protected by the statute. To the extent that we must interpret the meaning of the statutory language—"understanding the nature and consequences of the sexual act"—we construe it strictly against the Commonwealth, because the statute is penal in nature, and limit its application to cases falling clearly within its ambit. Turner v. Commonwealth, 226 Va. 456, 459, 309 S.E.2d 337, 338 (1983).

A person suffers from a "mental incapacity" within the meaning of the statute if he or she has a mental "condition" that "prevents" the person from being able to "understand" either the "nature" or "consequences" of engaging in sexual intercourse.  To "understand" is "to grasp the meaning of[; to] comprehend," Webster's Third New International Dictionary 2490 (1986) or "to know; to apprehend the meaning; to appreciate."  Black's Law Dictionary 1526 (6th ed. 1990).  See State v. Johnson, 745 P.2d 81 (Ariz. 1987) (en banc) (discussing the meaning of "to understand").  "Nature" is defined as the "normal and characteristic quality . . . of something," "the distinguishing qualities or properties of something."  Webster's Third New International Dictionary 1507 (1986).  "Consequence" is defined as "something that is produced by a cause or follows from a form of necessary connection or from a set of conditions: a natural or necessary result."  Id. at 482.

To "know, apprehend, or appreciate" the "nature and consequences" of sexual intercourse can range from a simple understanding of how the act of coitus is physically accomplished together with an understanding that a sensation of pleasure may accompany the act, to a thorough and comprehensive understanding of the complex psychological and physiological "nature" of "the sexual act involved" and that, aside from immediate gratification, the act may have dire familial, social, medical, physical, economic, or spiritual consequences.

Manifestly, the legislature did not intend to include as part of the protected class of people under Code § 18.2-61(A)(ii) those whose mental impairment or handicap may prevent them from comprehending the more complex aspects of the nature or consequences of sexual intercourse, but who, nevertheless, have the mental capacity to have a basic understanding of the elementary and rudimentary nature and consequences of sexual intercourse.  Not all persons who are mentally retarded or handicapped need the special protection of Code § 18.2-61(A)(ii).  The range of intellectual functioning among the mentally impaired and mentally retarded varies widely.  The statute was not designed to unfairly punish the sexual partners of those mentally impaired or mentally retarded persons who have a basic understanding of the act and consequences of sexual intercourse and are capable of making a volitional choice to engage or not engage in such conduct.

The commentary of the Supreme Court of New Jersey interpreting a similar statute is noteworthy:

> The statutory concept of ["mental incapacity"] implicates both the intellectual or cognitive capacity and the volitional or consensual capacity of the individual with respect to personal sexual activity.  The consensual capacity involves knowing that one's body is private and is not subject to the physical invasions of another, and that one has the right and ability to refuse to engage in sexual activity.  The cognitive capacity, which is also implicit in the notion of consensual capacity, involves the knowledge that the conduct is distinctively sexual.

Olivio, 589 A.2d at 604-05.

When a mentally impaired or mentally retarded person has sufficient cognitive and intellectual capacity to comprehend or appreciate that he or she is engaging in intimate or personal sexual behavior which later may have some effect or residual impact upon the person, upon the person's partner, or upon others, then the person does not have a "mental incapacity" within the meaning of the statute. If a person is mentally incapacitated but, nevertheless, has the capacity to understand the nature and consequences of the sexual act, which understanding includes the capacity to make a volitional choice to engage or not engage in such act, then that person's sexual partner has not violated the rape statute merely because a mentally impaired person has made an unwise decision or has chosen to be sexually active.

The fact finder cannot infer from proof of general mental incapacity or retardation or an IQ range or mental age that a victim is prevented or unable to understand the nature and consequences of a sexual act, unless the evidence proves that the victim lacks the ability to comprehend or appreciate either the distinguishing characteristics or physical qualities of the sexual act or the future natural behavioral or societal results or effects which may flow from the sexual act. The Commonwealth has the burden to prove every element of the offense in order to prove guilt beyond a reasonable doubt.

-14-

In this case, the Commonwealth presented testimony of Dr. Culbert, an expert witness; the victim's mother; and the victim. Dr. Culbert testified that the victim had an IQ of fifty-nine and a mental age of 10.4 years. He did not relate her IQ or her mental age to her capacity to understand the nature or consequences of sexual intercourse, particularly her capacity to make a volitional choice. On cross-examination, Dr. Culbert stated that although he measured her IQ and general intellectual capacity, he did not know whether Teresa understood or could use words like "penis" and "vagina," because he does not test such knowledge. Teresa's mother testified that Teresa is "severe[ly] mentally retarded."

When Teresa testified, she stated, on cross-examination, that she "made love" to the appellant, that she knew that she could get pregnant from "making love" and could catch AIDS, that she had had sex education classes in school, and she used the words "penis" and "vagina" when describing the act of sexual intercourse. The Commonwealth did not explore the extent to which she knew or understood the significance of these words or engaging in sexual intercourse. No attempt was made to prove that Teresa may have been superficially mouthing these words to describe what had happened to her or to explain that she did not understood the nature and consequences of her actions. In fact, her testimony shows that she was the person who conceived the notion of having sexual intercourse with Adkins and initiated the

sexual liaison between them.

We recognize that a person may passively or suggestively take advantage of a mentally retarded or incapacitated individual; however, the fact that a victim may have diminished mental capacity does not relieve the Commonwealth of its burden of proving that the "mental incapacity" is that defined by Code § 18.2-67.10(3). We, therefore, find that the Commonwealth failed to meet its burden.

Adkins also contends that the evidence failed to prove an additional element of the offense—that he "accomplished" having sexual intercourse with Teresa "through the use of" her mental incapacity. He argues that the evidence failed to show that he knowingly used or took advantage of her incapacity in order to accomplish the act of sexual intercourse. His argument would have us address whether he could have "accomplished" the result by knowingly taking advantage of a condition through passive conduct. However, because we find the evidence insufficient to prove that Teresa had a mental incapacity as defined in the statute, we do not address this contention. For the foregoing reasons, we reverse the conviction and dismiss the indictment.

<u>Reversed and dismissed.</u>