COURT OF APPEALS OF VIRGINIA


Present:  Judges Beales, Powell and Alston
Argued at Richmond, Virginia


WOODROW WILSON NICHOLSON

OPINION BY
v.      Record No. 0168-09-4                JUDGE ROSSIE D. ALSTON, JR.
JULY 13, 2010
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF WARREN COUNTY
Dennis L. Hupp, Judge

Joseph A. Sadighian, Senior Assistant Appellate Defender (Office of
the Appellate Defender, on brief), for appellant.

Joshua M. Didlake, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Woodrow Wilson Nicholson (appellant) was convicted in a bench trial of aggravated

sexual battery, through the use of the victim's mental incapacity, in violation of Code

§ 18.2-67.3.  On appeal, appellant argues that the Commonwealth failed to prove he committed

aggravated sexual battery because the evidence was insufficient to prove that appellant forced

the victim to touch his intimate parts.  Specifically, appellant argues that Code § 18.2-67.3

requires the use of actual force to establish sexual abuse when the complaining witness is

mentally incapacitated.  We hold that Code § 18.2-67.3 does not require the use of actual force

under these circumstances.  Therefore, we affirm the judgment of the trial court.

I.  BACKGROUND

"On appeal, we review the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deducible therefrom."  Martin v. Commonwealth, 4

Va. App. 438, 443, 358 S.E.2d 415, 418 (1987).  Viewed through this evidentiary prism, the

evidence established that J.A., a forty-four-year-old man with Down's Syndrome, touched appellant's penis on February 5, 2008. At that time, J.A. was a client at Blue Ridge Opportunities (Blue Ridge), a facility that provides vocational and social training for mentally disabled adults and students.

On February 5, 2008, J.A. left Blue Ridge at approximately 9:15 a.m. for his work assignment at a nearby business. Candy Lamb (Lamb), the program director at Blue Ridge, went outside shortly after J.A. departed and saw him talking to a man in the Blue Ridge parking lot. This man was later identified as appellant. Lamb approached J.A. and told him that he needed to go to work. J.A. assented and began walking away from Blue Ridge. Lamb asked appellant if she could help him, and appellant responded that he was waiting for the pawnshop to open for the day.

Lamb went back to her workplace, but continued to watch J.A. from the door of the facility. She saw appellant pursue and ultimately catch up with J.A. The two men crossed the street together and entered an alley. Concerned for J.A.'s safety, Lamb went back outside and walked toward the alley. When she was standing approximately eighteen feet from appellant and J.A., she shouted at J.A. to come over to her. At this time, J.A. was facing Lamb, and appellant stood between them, with his back to Lamb and the street. J.A. walked over to Lamb, and appellant turned towards her. Lamb could see that appellant's pants were undone and that his penis was exposed. Lamb and J.A. went back to Blue Ridge and called the police. Lamb did not see J.A. touch appellant nor did she see appellant touch J.A. during this encounter.

After the police found appellant at a local business, appellant agreed to accompany them to the police station. Corporal S. Mauck formally Mirandized appellant and interviewed him regarding his earlier interaction with J.A. Corporal Mauck testified that a slight odor of alcohol emanated from appellant's person during the interview. Appellant claimed he had a "couple

shots of bourbon and some wine" that morning. During the interview, Corporal Mauck told appellant that he had been seen near Blue Ridge, which the corporal referred to as a "school for handicapped people." He also informed appellant that both J.A. and an employee at the school told Corporal Mauck that appellant had exposed himself in the alley near Blue Ridge. Corporal Mauck repeatedly told appellant that he knew that "a handicapped boy" had touched appellant's penis. Appellant repeatedly denied any involvement with the "handicapped boy." After being pressed on the issue, appellant stated numerous times that if any touching did occur, he "was sorry." Appellant said that his mind was "confused," presumably from his consumption of alcohol. After Corporal Mauck told appellant that only guilty individuals apologized for their actions, appellant stated that J.A. "talked [him] into it," by offering to "play with" appellant's penis in exchange for money to buy a soda. According to appellant, when appellant agreed to J.A.'s proposition, J.A. unzipped appellant's pants and touched appellant's penis. Subsequently, appellant demonstrated how J.A. touched appellant's penis. Additionally, he claimed that he was unaware that J.A. was mentally disabled, and asserted that he was not sure if J.A. was male or female. Appellant's statement was recorded and viewed by the trial court during appellant's bench trial for aggravated sexual battery.

In addition to Lamb's testimony and appellant's taped statement, the Commonwealth presented the testimony of J.A.'s sister and legal guardian, Caroline Jo Johnson (Johnson), and Kathy Wolfe-Heberle (Wolfe-Heberle), Blue Ridge's president, during the trial. According to Wolfe-Heberle, J.A. was "severely mentally retarded" and possessed the functional ability of a child between the ages of five and ten years old.

Johnson testified that she became J.A.'s primary caretaker in November 2006, when J.A. moved in with Johnson and her husband. As J.A.'s legal guardian, Johnson was responsible for taking care of his needs, managing his finances, and providing reports to Social Services

regarding his well-being. Johnson described her brother's ability to take care of his personal hygiene. While he could bathe himself, Johnson had to take care of many other tasks, such as helping him into the shower, turning on the water, and providing him with towels and washcloths. She washed his hair and trimmed his fingernails and toenails. J.A. was able to perform simple chores like making his bed, and he was able to follow Johnson's simple directions. Johnson explained that if she asked J.A. to complete multiple tasks at once, he was unable to remember all of them.

Johnson testified that J.A. enjoyed coloring with crayons in children's coloring books and watching the same television shows that he enjoyed as a child, such as *I Love Lucy* and *The Brady Bunch*. Johnson stated that he had never shown any interest in more mature programming. Additionally, Johnson testified that J.A. lacked initiative. Specifically, she stated that J.A. would follow directions given to him by other adults, even if they were strangers, and that he was unable to negotiate for a reward in exchange for following directions.

Finally, Johnson testified that J.A. had not expressed an interest in sex since he began living with her in 2006. She stated that her brother's genitals had never developed and that he had no underarm or facial hair. Johnson had never seen J.A. sexually aroused, and she had never seen evidence of nocturnal emissions or other discharges while cleaning his laundry. She stated that J.A. had a "girlfriend," whom he saw once a year. J.A. spoke to his girlfriend on the telephone, and either Johnson or J.A.'s girlfriend's mother chaperoned their dates. Johnson said the couple held hands and J.A. sometimes kissed his girlfriend on the cheek or hugged her while saying goodbye.

Wolfe-Heberle, a Qualified Mental Health Retardation Professional certified through Virginia's Department of Mental Health Retardation and Substance Abuse Services, qualified as an expert in "the cognitive abilities of individuals suffering from mental retardation," and the

trial court allowed her to testify regarding J.A.'s functional capacity and his understanding of

sexual acts. For the two-and-one-half years preceeding J.A.'s interaction with appellant,

Wolfe-Heberle oversaw J.A.'s treatment plan at Blue Ridge. One aspect of Blue Ridge's

training plan involved functional assessments of the facility's clients. Wolfe-Heberle classified

J.A.'s level of mental retardation as "in the upper end of severe" mental retardation, and she

stated that he was not able to live independently. She stated that J.A. lacked the ability to

perform complex reasoning or understand complicated logic. Notably, Wolfe-Heberle stated that

J.A. was not capable of negotiating. Specifically, she explained:

> [J.A.] does not have the ability to negotiate. He doesn't understand
> that process at all. . . . I can tell [J.A.], if you do this[,] I will give
> you a cookie. He understands what a reward is. But, rewards are
> different than the negotiation process.

> [J.A.] does not have the ability to come to me and say, "Kathy, if
> you do this[,] then I will give you this." It is not reversed.

Wolfe-Heberle stated that J.A. did not understand the concept of money, except for the

fact that he needed "two quarters to get a soda out of the [vending] machine." According to

Wolfe-Heberle, J.A. purchased cans of sodas from a vending machine near the alley where Lamb

had seen J.A. and appellant.

Finally, Wolfe-Heberle stated that J.A. did not have an understanding of sex or the nature

and consequence of sex acts of any type. J.A. never expressed an interest in sex and never

showed any interest in touching of a sexual nature. Wolfe-Heberle testified that J.A. had "no

concept or no clue even to use the word 'penis.' He does not understand what the word is. So,

he is not aware that [the penis has a sexual function]." Wolfe-Heberle stated that for J.A., "[t]he

penis is used to pee. The penis is not used for sex." Wolfe-Heberle acknowledged that J.A.

participated in Blue Ridge's sexual education program, by attending group discussions about

condoms and sexually transmitted diseases, but "he [did not] have any understanding of what it

mean[t]." During one such session, Wolfe-Heberle showed the group how to put a condom on a cucumber. J.A. "was kind of oblivious to the entire conversation."

The trial court determined that J.A. was incompetent to testify. In addition to the expert testimony and the testimony of Johnson and Lamb, the Commonwealth presented color photographs of J.A. The Commonwealth stated that the purpose of admitting the photographs into evidence was to show that J.A. exhibited physical characteristics associated with Down's Syndrome. There was no direct evidence that appellant knew that J.A. was mentally incapacitated.

Appellant moved to strike the evidence at the close of the Commonwealth's case-in-chief and at the close of all of the evidence. Appellant argued that Code §§ 18.2-67.3 and 18.2-67.10 required the Commonwealth to prove that appellant used actual force to make J.A. touch appellant's intimate parts. Preliminarily, the trial court rejected appellant's assertion that J.A. offered to touch appellant's intimate parts in exchange for money and found that J.A. touched appellant's intimate parts "at the invitation" of appellant. Then the trial court cited Martin v. Commonwealth, 272 Va. 31, 630 S.E.2d 291 (2006), for the proposition that the use of constructive force to accomplish a sexual touching would support a finding of guilt under Code § 18.2-67.3(A)(2). The trial court held that J.A.'s mental incapacitation precluded him from legally consenting to the touching of appellant's intimate parts, and therefore appellant constructively forced J.A. to touch appellant's penis. The trial court convicted appellant of aggravated sexual battery, and this appeal followed.

## II. ANALYSIS

The trial court convicted appellant of aggravated sexual battery under Code § 18.2-67.3(A)(2), which states in pertinent part: "An accused shall be guilty of aggravated sexual battery if he or she sexually abuses the complaining witness, and . . . [t]he act is

accomplished through the use of the complaining witness's mental incapacity or physical helplessness." Code § 18.2-67.10(3) defines "mental incapacity" as the "condition of the complaining witness existing at the time of an offense . . . which prevents the complaining witness from understanding the nature or consequences of the sexual act involved in such offense and about which the accused knew or should have known." Appellant does not contest on appeal that J.A.'s mental retardation prevented him from "understanding the nature or consequences of the sexual act involved in such offense"; however, he denies on appeal that he knew or should have known that J.A. was mentally incapacitated.

Code § 18.2-67.10(6)(b) defines "sexual abuse" as "an act committed with the intent to sexually molest, arouse, or gratify any person, where . . . [t]he accused *forces* the complaining witness to touch the accused's, the witness's own, or another person's intimate parts or material directly covering such intimate parts." (Emphasis added).

Appellant argues on appeal that the evidence at trial showed J.A. offered to touch appellant's intimate parts, and appellant merely acquiesced to this offer. Appellant argues that to be guilty of aggravated sexual battery under Code § 18.2-67.3(A), appellant had to accomplish an act of sexual abuse against J.A. through the use of J.A.'s mental incapacity. Appellant claims that under the statute, sexual abuse only occurred if appellant "forced" J.A. to touch appellant's intimate parts. Appellant asserts that the fact that J.A. was mentally incapacitated does not lead to the conclusion that appellant used constructive force to accomplish the inappropriate touching. In furtherance of this argument, appellant maintains that if the General Assembly intended the complaining witness' mental incapacity to be considered in the determination that sexual abuse occurred, the General Assembly would have discussed the complaining witness' mental incapacity in the definition of sexual abuse found in Code § 18.2-67.10(6). According to appellant, because mental incapacity is solely mentioned in the aggravated sexual battery statute,

it cannot be considered in determining if sexual abuse, as defined in Code § 18.2-67.10(6), occurred. He contends that this Court cannot uphold appellant's conviction, because appellant merely "allowed J.A., who offered to play with [appellant's] privates, to touch [appellant's] privates," and this acquiescence does not constitute a use of "force" under Code § 18.2-67.10(6)(b). We disagree.

The determination of the definition of "force" as used by the General Assembly in Code § 18.2-67.10(6)(b) is a question of statutory interpretation, and therefore, this Court reviews the question *de novo*. See Johns v. Commonwealth, 53 Va. App. 742, 746, 675 S.E.2d 211, 213 (2009) (citing Giles v. Commonwealth, 277 Va. 369, 373, 672 S.E.2d 879, 882 (2009)). While reviewing the trial court's legal conclusions *de novo*, we "giv[e] deference to the trial court's findings of fact unless the findings are 'plainly wrong or without evidence to support them.'" Carter v. Commonwealth, 42 Va. App. 681, 686, 594 S.E.2d 284, 287 (2004) (quoting Timbers v. Commonwealth, 28 Va. App. 187, 193, 503 S.E.2d 233, 235-36 (1998)). "[T]he 'trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise.'" Sanford v. Commonwealth, 54 Va. App. 357, 359, 678 S.E.2d 842, 843 (2009) (quoting Haskins v. Commonwealth, 44 Va. App. 1, 11, 602 S.E.2d 402, 407 (2004)). Thus, "the credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995) (citing Schneider v. Commonwealth, 230 Va. 379, 382, 337 S.E.2d 735, 736-37 (1985); Carter v. Commonwealth, 223 Va. 528, 532, 290 S.E.2d 865, 867 (1982)).

In deciding the motion to strike at the close of the Commonwealth's evidence, the trial court found that J.A. was mentally incapacitated, that J.A. touched appellant's penis, and that the touching was at the invitation of appellant. We can infer from the trial court's ruling that the

trial court made these same factual findings when convicting appellant of aggravated sexual battery. On appeal, appellant urges us to disregard the trial court's factual finding that appellant invited J.A. to participate in the sexual touching. Appellant states that "the only evidence concerning how J.A. came to touch [appellant] was [appellant's] statement that J.A. offered to play with his penis for some money." Nevertheless, it is clear from the trial court's ruling that the trial court rejected appellant's statement to the police and instead concluded that appellant invited J.A. to touch him.

It is true that a trial court "'may not arbitrarily disregard uncontradicted evidence of unimpeached witnesses which is not inherently incredible and not inconsistent with the facts in the record,'" Williams v. Commonwealth, 14 Va. App. 666, 669-70, 418 S.E.2d 346, 348 (1992) (quoting Hankerson v. Moody, 229 Va. 270, 274, 329 S.E.2d 791, 794 (1985)); however, we find that there was sufficient evidence to support the trial court's rejection of appellant's statement that J.A. offered to touch appellant's intimate parts. In weighing appellant's credibility, the trial court was entitled to consider the fact that appellant gave multiple accounts of his interaction with J.A. on the date of the offense. See Lea v. Commonwealth, 16 Va. App. 300, 304, 429 S.E.2d 477, 479 (1993) (acknowledging that "[d]etermining the credibility of witnesses who give conflicting accounts is within the exclusive province of the [fact finder]"). Appellant first denied interacting with "a handicapped boy." Later appellant said that his mind had been "confused," so he did not remember the day well, but if any inappropriate touching did happen, it was an accident for which he was sorry. Finally, appellant said that he didn't remember if he encountered a boy or a girl that day, but the person "talked [him] into" the arrangement by offering to touch appellant's penis in exchange for money. Appellant then demonstrated how J.A. touched appellant's penis.

In determining appellant's credibility, the trial court also had discretion to consider the testimony of J.A.'s sister and primary caretaker, Johnson, and Wolfe-Heberle. Both women stated that J.A. did not possess the ability to negotiate, and Johnson stated that J.A. was very trusting and would obey the directions of any adult. Thus, there was evidence that contradicted appellant's assertion that J.A. initiated the touching. Because "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt," Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998) (citing Speight v. Commonwealth, 4 Va. App. 83, 88, 354 S.E.2d 95, 98 (1987) (*en banc*)), we cannot conclude that the trial court erred in finding appellant's version of his encounter with J.A. was fabricated and appellant was lying to conceal his guilt.

Similarly, we can infer that in finding appellant guilty of aggravated sexual battery, the trial court found appellant's claim that he did not know J.A. was mentally incapacitated to be incredible. We cannot say that this determination was plainly wrong, because as previously noted, the "fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude the accused is lying to conceal his guilt." Id. (citing Speight, 4 Va. App. at 88, 354 S.E.2d at 98). Additionally, throughout the interrogation, Corporal Mauck repeatedly referred to J.A. as "the handicapped boy," a characterization that appellant did not dispute until Corporal Mauck asked him directly if he knew that J.A. was "handicapped."

Having resolved the credibility claims appellant presents on appeal, we consider appellant's arguments regarding the application of Code § 18.2-67.10(6) to his conduct. Again, when considering the question of law presented by this case, which we review *de novo*, we are bound by the trial court's factual findings, if they are not "'plainly wrong.'" Carter, 42 Va. App. at 686, 594 S.E.2d at 287 (quoting Timbers, 28 Va. App. at 193, 503 S.E.2d at 235-36).

Appellant argues that appellant's conduct, taken in the light most favorable to the Commonwealth, did not constitute "sexual abuse," as defined by Code § 18.2-67.10(6), which provides:

> "*Sexual abuse*" means an act committed with the intent to sexually molest, arouse, or gratify any person, where:
>
> a. The accused intentionally touches the complaining witness's intimate parts or material directly covering such intimate parts;
>
> b. The accused forces the complaining witness to touch the accused's, the witness's own, or another person's intimate parts or material directly covering such intimate parts;
>
> c. If the complaining witness is under the age of 13, the accused causes or assists the complaining witness to touch the accused's, the witness's own, or another person's intimate parts or material directly covering such intimate parts; or
>
> d. The accused forces another person to touch the complaining witness's intimate parts or material directly covering such intimate parts.

Appellant contends that in order to be guilty of a violation of Code § 18.2-67.3(A), the specific offensive conduct must constitute sexual abuse, which is defined without mention of the mental capacity of the victim. According to appellant, the Commonwealth was required by subsection (b) of Code § 18.2-67.10(6) to prove appellant "force[d] the complaining witness to touch the accused's . . . intimate parts . . . ," and this force could not be proved through a mere showing that the victim was mentally incapacitated. Appellant argues that the trial court ignored both the basic principles of statutory construction and the Supreme Court's discussion in Martin regarding the 2004 amendments to Code § 18.2-67.3 in making its decision.

It is well settled that "'[t]he province of construction is wholly within the domain of ambiguity, and that which is plain needs no interpretation.'" Barnett v. D.L. Bromwell, Inc., 6 Va. App. 30, 34, 366 S.E.2d 271, 273 (1988) (quoting Winston v. City of Richmond, 196 Va.

- 11 -

403, 408, 83 S.E.2d 728, 731 (1954)). "[W]hen the General Assembly has used words that have a plain meaning, courts cannot give those words a construction that amounts to holding that the General Assembly meant something other than that which it actually expressed." Lee County v. Town of St. Charles, 264 Va. 344, 348, 568 S.E.2d 680, 682 (2002) (citing Vaughn, Inc. v. Beck, 262 Va. 673, 677, 554 S.E.2d 88, 90 (2001); Halifax Corp. v. First Union Nat'l Bank, 262 Va. 91, 100, 546 S.E.2d 696, 702 (2001)). When bound by the plain meaning of the language used, appellate courts are not permitted "to add or subtract from the words used in the statute." Posey v. Commonwealth, 123 Va. 551, 553, 96 S.E. 771, 771 (1918). Instead, appellate courts "must . . . assume . . . the legislature chose, with care, the words it used when it enacted the relevant statute," Barr v. Town & Country Properties, Inc., 240 Va. 292, 295, 396 S.E.2d 672, 674 (1990), and appellate courts have a duty to give "reasonable effect to every word," Jones v. Conwell, 227 Va. 176, 181, 314 S.E.2d 61, 64 (1984); accord Moyer v. Commonwealth, 33 Va. App. 8, 35, 531 S.E.2d 580, 593 (2000) (*en banc*). Further, "[w]hen a penal statute is unclear, the statute must be strictly construed against the Commonwealth and in favor of an accused's liberty, and the accused is entitled to the benefit of any reasonable doubt concerning the statute's construction." Waldrop v. Commonwealth, 255 Va. 210, 214, 495 S.E.2d 822, 825 (1998). Before the accused can be punished, however offensive his conduct, "'his case must be plainly and unmistakably within the statute.'" Harward v. Commonwealth, 229 Va. 363, 365, 330 S.E.2d 89, 90 (1985) (quoting United States v. Lacher, 134 U.S. 624, 628 (1890)).

On appeal, appellant suggests that the trial court misapplied Martin, 272 Va. 31, 630 S.E.2d 291, when it held that under Martin, Code § 18.2-67.10(6)(b) did not require actual force; it only required that the accused employ constructive force. Appellant argues that the trial court erred when it found that under Martin, a showing that J.A. was mentally incapacitated was evidence that appellant used constructive force.

- 12 -

In Martin, the defendant, "then fourteen years old, exposed his penis to the eight-year-old victim, asked the victim to masturbate him and, following [the defendant's] directions, the victim complied." Id. at 33, 630 S.E.2d at 291. The defendant was convicted of aggravated sexual battery under subsection (A)(1) of Code § 18.2-67.3 based on his sexual abuse of the victim as defined by the 2003 version of Code § 18.2-67.10(6)(b). Id. at 34, 630 S.E.2d at 292. In 2003, Code § 18.2-67.10(6)(b) stated that sexual abuse occurred when "[t]he accused forces the complaining witness to touch the accused's, the witness's own, or another person's intimate parts or material directly covering such intimate parts." The defendant argued in Martin that the Code required "an overt act of actual force and that, in the absence of such an act, [the defendant's] conviction [could not] be sustained." 272 Va. at 34, 630 S.E.2d at 292. The Supreme Court disagreed with the defendant, finding that Virginia's jurisprudence had long recognized "that 'force' may include both constructive and actual force and in the absence of any legislative definition of 'force,' [the Supreme Court could not] conclude that the General Assembly intended to limit the meaning of the word 'force' to actual force for purposes of Code § 18.2-67.10(6)(b)." Id. at 35, 630 S.E.2d at 292 (citing Waterman v. Halverson, 261 Va. 203, 207, 540 S.E.2d 867, 869 (2001); Dodson v. Potomac Mack Sales & Service, Inc., 241 Va. 89, 94, 400 S.E.2d 178, 180 (1991)).

The Supreme Court stated "that in the context of sexual crimes, an act undertaken against a victim's will and without the victim's consent is an act undertaken with force." Id. (citing Jones v. Commonwealth, 219 Va. 983, 986, 252 S.E.2d 370, 372 (1979)). The Supreme Court turned to rape prosecutions for guidance regarding sexual abuse prosecutions:

> [I]n the context of a rape prosecution, we held that constructive force exists if the victim could not legally consent to the act. Stump [v. Commonwealth], 137 Va. [804,] 807, 119 S.E. [72,] 73 [(1923)]. Proof of the absence of legal consent provides "all the force which the law demands as an element of the crime." Bailey v. Commonwealth, 82 Va. (97 Hans.) 107, 111 (1886).

- 13 -

Id.  The Supreme Court concluded "'force' includes actual and constructive force and that constructive force includes engaging in proscribed conduct with a victim who is under the legal age of consent."  Id.

The Supreme Court also addressed the defendant's argument that "[w]here a statute proscribes certain behavior based on both the age of the victim and the fact that the act was accomplished using force, it would be incongruous to conclude that proving the victim was beneath the common-law age of consent satisfied the express requirement of proving force."  Id. at 35, 630 S.E.2d at 293 (citing Martin v. Commonwealth, No. 1966-04-4, 2005 Va. App. LEXIS 337, at *19 (Sept. 6, 2005) (Elder, J., dissenting)).  The Supreme Court found that

> the use of a common set of facts for proof of differing elements of a crime is [not] incongruous.
> 　The prosecution for aggravated sexual battery in this case required a showing of sexual abuse under Code § 18.2-67.10(6)(b), which includes proof of force, and a showing that the victim was under 13 years of age, Code § 18.2-67.3(A)(1).  The common factual element in this case - the age of the victim - serves as proof of both the force requirement and the age requirement.  Such a circumstance is neither improper nor incongruous.

Id. at 36, 630 S.E.2d at 293.

Finally, the Martin Court discussed the 2004 amendment to Code § 18.2-67.10(6), which the defendant asserted supported the theory that actual force was necessary to establish sexual abuse under the circumstances of that case:

> The 2004 amendment added a new subparagraph (c) to the definition of sexual abuse set out in that statute: where the accused causes a victim under the age of thirteen to touch the intimate parts or clothing covering the intimate parts of the accused, the victim or another person.  Code § 18.2-67.10(6)(c).  The 2004 amendment did not remove the element of force from the other actions defined as sexual abuse nor did it define "force" to exclude constructive force.  The substantive change effected by the 2004 amendment was the creation of a category of sexual abuse based on the age of the victim.  While force is not an element of this category of sexual abuse, it does not follow that actions undertaken with constructive force could not qualify as sexual abuse under other provisions of the current statute or under the provisions of the previous statute.

Therefore, we do not consider the 2004 amendment as altering the definition of force when used in the context of sexual crimes.

Id. at 35, 630 S.E.2d at 293.

Appellant points to the Supreme Court's holding that the 2004 amendment to Code § 18.2-67.10(6) "did not remove the element of force from the other actions defined as sexual abuse nor did it define 'force' to exclude constructive force," to argue that the fact that J.A. was mentally incapacitated alone did not prove that appellant used constructive force to accomplish the inappropriate touching.[1] Appellant argues that the Commonwealth did not show constructive force, as defined in Black's Law Dictionary: "Constructive force is anything which produces fear sufficient to suspend the power of resistance and prevent the free exercise of the will. Actual force is applied to the body; constructive is by threatening words or gestures and operates on the mind." Black's Law Dictionary 284 (5th ed. 1979).

We disagree with appellant's analysis of the Code and the case law relating to sexual abuse and mental incapacity. In particular, we find Martin and Adkins v. Commonwealth, 20 Va. App. 332, 457 S.E.2d 382 (1995), instructive. Pursuant to Martin, the General Assembly did not "intend[ ] to limit the meaning of the word 'force' to actual force." 272 Va. at 35, 630 S.E.2d at 292. The Martin Court explicitly held that "an act undertaken against a victim's will and without the victim's consent is an act undertaken with force." Id. (citing Jones, 219 Va. at 986, 252 S.E.2d at 373). Thus, in the context of this case, constructive force existed if J.A. could not legally consent to the sexual touching. See id. (citing Stump, 137 Va. at 807, 119 S.E. at 73).

In Adkins, this Court held that a rape occurred in violation of Code § 18.2-61(A)(ii), if the victim is mentally incapacitated as defined in Code § 18.2-67.10(3), such that the victim

---

[1] Specifically, appellant argued that the Commonwealth had to show that appellant's acceptance of J.A.'s offer to "play with" appellant's penis constituted constructive force. As previously noted, the trial court rejected this factual account of appellant's encounter with J.A., and we will not discuss it further herein.

"does not understand 'the nature and consequences of the sexual act involved.'"  Adkins, 20

Va. App. at 343, 457 S.E.2d at 387 (citing Code § 18.2-67.10(3)).  This Court reversed Adkins'

conviction for having sexual intercourse with a mentally impaired sixteen-year-old girl through

the use of her mental incapacity, in violation of Code § 18.2-61(A)(ii), id. at 336, 457 S.E.2d at

384, after finding that although the sixteen-year-old girl suffered from a mental impairment, the

Commonwealth failed to prove that she did not understand the nature or consequences of sexual

intercourse.  Id. at 347, 457 S.E.2d at 389.  This Court found there was insufficient evidence to

prove Adkins had sexual intercourse with the girl "through the use of" her mental incapacity.  Id.

at 347, 457 S.E.2d at 389.

In interpreting the rape statute, this Court engaged in a lengthy examination of the

General Assembly's intent in prohibiting sexual intercourse with an individual "through the use

of" the individual's mental incapacity.  We stated,

> The legislative purpose of Code § 18.2-61(A)(ii) is to
> protect persons who are mentally impaired or retarded from being
> sexually exploited due to their mental incapacity.  See State v.
> Ortega-Martinez, 881 P.2d 231, 236 (Wash. 1994) (explaining the
> legislative purpose of a similar statute).  However, such statutes
> must not be interpreted and applied in a manner that creates an
> unintended rule that would prohibit all mentally impaired or
> retarded persons from engaging in consensual sexual intercourse
> without having their partners commit a felony.  See State v. Olivio,
> 589 A.2d 597, 604 (N.J. 1991) (expressing concern about
> "unenlightened attitudes toward mental impairment and about the
> importance of according the mentally handicapped their
> fundamental rights").  By specifically defining mental incapacity,
> the legislature has chosen to protect those mentally deficient
> persons whose mental condition prevents them from
> "understanding the nature and consequences of the sexual act
> involved."  Code § 18.2-67.10(3).

Id. at 342-43, 457 S.E.2d at 387 (footnote omitted).  Code § 18.2-67.3 shares the legislative

purpose of Code § 18.2-61, which was at issue in Adkins.  See City of Richmond v. Confrere

Club of Richmond, Va., Inc., 239 Va. 77, 80, 387 S.E.2d 471, 473 (1990) ("Legislative intent is

determined from the plain meaning of the words used." (citing Marsh v. City of Richmond, 234 Va. 4, 11, 360 S.E.2d 163, 167 (1987); Va. Dept. of Labor v. Westmoreland Coal Co., 233 Va. 97, 99, 353 S.E.2d 758, 760-61 (1987); Ambrogi v. Koontz, 224 Va. 381, 386, 297 S.E.2d 660, 662 (1982))). Code § 18.2-67.3 also protects mentally impaired individuals, specifically those persons who lack an "understanding [of] the nature and consequences" of sexual acts, from sexual exploitation.

The Adkins Court's narrow definition of "mental incapacity" and the narrow circumstances during which sexual abuse is accomplished "through" the victim's mental incapacity is also relevant to our instant analysis:

> Manifestly, the legislature did not intend to include as part of the protected class of people under Code § 18.2-61(A)(ii) those whose mental impairment or handicap may prevent them from comprehending the more complex aspects of the nature or consequences of sexual intercourse, but who, nevertheless, have the mental capacity to have a basic understanding of the elementary and rudimentary nature and consequences of sexual intercourse. Not all persons who are mentally retarded or handicapped need the special protection of Code § 18.2-61(A)(ii). The range of intellectual functioning among the mentally impaired and mentally retarded varies widely. The statute was not designed to unfairly punish the sexual partners of those mentally impaired or mentally retarded persons who have a basic understanding of the act and consequences of sexual intercourse and are capable of making a volitional choice to engage or not engage in such conduct.

Adkins, 20 Va. App. at 345, 457 S.E.2d at 388.

Finally, and most pertinent to our analysis, the Adkins Court concluded that,

> When a mentally impaired or mentally retarded person has sufficient cognitive and intellectual capacity to comprehend or appreciate that he or she is engaging in intimate or personal sexual behavior which later may have some effect or residual impact upon the person, upon the person's partner, or upon others, then the person does not have a "mental incapacity" within the meaning of the statute. If a person is mentally incapacitated but, nevertheless, has the capacity to understand the nature and consequences of the sexual act, which understanding includes the capacity to make a

- 17 -

> volitional choice to engage or not engage in such act, then that person's sexual partner has not violated the rape statute merely because a mentally impaired person has made an unwise decision or has chosen to be sexually active.

Id. at 345-46, 457 S.E.2d at 388-89.

The converse of the above analysis is also true. A mentally incapacitated individual may not have the "capacity to make a volitional choice to engage or not engage" in a sexual act due to their lack of understanding of the nature and consequences of the sexual act. See id. Accordingly, when an individual is mentally incapacitated under Code § 18.2-67.10(3), the individual is incapable of legally consenting to the sexual touching, on the grounds that "[c]onsent without understanding is no consent at all." Molina v. Commonwealth, 47 Va. App. 338, 358, 624 S.E.2d 83, 92 (2006) (holding that a jury instruction regarding the victim's mental incapacitation did not prejudice the defendant in a jury trial for rape).

In the instant case, the trial court found that J.A. did not have the mental capacity to understand the nature and consequences of the sexual act. As discussed above, the evidence at trial was sufficient to support this conclusion, and therefore, as a matter of law, J.A. did not have the ability to provide legal consent to the sexual touching that appellant invited. Accordingly, appellant sexually abused J.A. by constructively forcing him to touch appellant's intimate parts, and this sexual abuse constituted aggravated sexual battery because the touching was accomplished through J.A.'s mental incapacity.[2]

---

[2] As the Supreme Court found in Martin, "the use of a common set of facts for proof of differing elements of a crime" is appropriate in the instant case. See 272 Va. at 36, 630 S.E.2d at 293.

## III.  CONCLUSION

For the reasons stated, we find no error in the judgment of the trial court.  Therefore we affirm the appellant's conviction for aggravated sexual battery.

<u>Affirmed.</u>