COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Judges Beales, Russell and Senior Judge Haley
Argued by videoconference


EDWIN GIOVANNI CHAVEZ MACIAS

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 0876-20-4                      JUDGE JAMES W. HALEY
                                                    OCTOBER 5, 2021
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                            David Bernhard, Judge

            Kathryn C. Donoghue, Senior Assistant Public Defender, for
            appellant.

            Katherine Quinlan Adelfio, Assistant Attorney General (Mark R.
            Herring, Attorney General, on brief), for appellee.


        Edwin Giovanni Chavez Macias, appellant, was convicted by a jury of rape, in violation of

Code § 18.2-61; sodomy, in violation of Code § 18.2-67.1; and animate object sexual penetration,

in violation of Code § 18.2-67.2. On appeal, appellant challenges the sufficiency of the evidence

to support his convictions. He also argues that the trial court erred by limiting his closing

argument "about evidence of transfer DNA." For the following reasons, we affirm.

                                        BACKGROUND

        "In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party at trial." Gerald v.

Commonwealth, 295 Va. 469, 472 (2018) (quoting Scott v. Commonwealth, 292 Va. 380, 381

(2016)). In doing so, we discard any of appellant's conflicting evidence, and regard as true all

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence. Id.

In the fall of 2015, D.A., a freshman at George Mason University, joined a sorority. Nicole Zorniak, an older member of the sorority, was D.A.'s "big sister" or mentor. On November 20, 2015, D.A., Zorniak, and other sorority members went to a party at an off-campus fraternity house. Jason Mehta, the fraternity's "social chair," testified that only members of his fraternity and D.A.'s sorority were invited to the party. The only exception was the hired DJ, Michael Lobos. Lobos, however, brought two "friends"—appellant and Youvraj Gill—to "help set up." Appellant wore a red coat or sweatshirt and danced "amongst the crowd" during the party. In addition, several sorority members testified that the party became "open to the public" at some point.

The fraternity house was a two-story single-family home with a basement. The "entry level" had a living room, kitchen, and full bathroom. An "ice luge" was in the kitchen, where partygoers could consume shots of "hard liquor." The bathroom opened into the kitchen and was large enough to comfortably fit two adults. From the kitchen, "narrow" stairs led down into a basement, where Lobos set up at a "makeshift DJ booth" in a corner. The top floor had several bedrooms and another bathroom.

D.A. and Zorniak arrived at the party between 8:00 and 9:00 p.m. with a bottle of vodka. Although D.A. denied drinking any alcohol before the party, Zorniak testified that she and D.A. had "at least one drink" before arriving. In addition, Tanner Lee, the fraternity's "risk management" officer, testified that D.A. appeared "partially intoxicated" when she arrived. At the party, D.A. consumed "multiple" shots of hard liquor from the ice luge in the kitchen. She then walked down the stairs into the basement, where she consumed a cup of "jungle juice"—a combination of alcohol and lemonade or fruit punch. While D.A. could not "recall" if she had

more than one cup of jungle juice, Mehta testified that Zorniak was "feeding [D.A.] alcohol" during the party.

D.A. recalled speaking to a fraternity member in the kitchen and dancing with Zorniak in the basement.  She did not remember anything else, however, until she "came to in the bathroom" on the house's entry level.  When D.A. regained consciousness, she was sitting on the toilet with a man in a red sweatshirt standing over her and forcing his penis "in and out of" her mouth "repeatedly."  His hands were on the back of her head, and he was not being "gentle."  D.A. could not stop the man because she "felt . . . paralyzed" and "couldn't move."  At some point, D.A. "slid off the toilet," landed on the floor, and "groaned."  The man "shush[ed]" for D.A. to be quiet as he lifted her from the floor, returned her to the toilet, replaced his hands on the back of her head, and reinserted his penis into her mouth.  When the man lifted D.A., she could tell that he was about the same height as her.

Later, the man lifted D.A. from the toilet and pushed her over the sink, causing her head to strike the faucet.  Again, D.A. was unable to stop him because she "felt paralyzed" and "had no control over [her] body."  D.A. felt the man's fingers "going in and out of [her] vagina" "multiple times."  She then felt his penis "insert into [her] vagina and go in and out more than once" as his fingers continued to search for "an opening."  D.A. described the encounter as "rough" and "painful" and reiterated that she could not stop him because she "was paralyzed" and "couldn't move."  She lost consciousness while the man "penetrated" her "with his fingers and with his penis."

D.A. did not remember anything else until she woke up in Zorniak's dorm room the next morning.  She was wearing a different shirt, her shorts had vomit on them, and her "vaginal area hurt."  D.A. was conscious only briefly—long enough to address four of her sorority sisters—

before she "blacked out again." She could not remember how long the incident in the bathroom lasted or how she got to Zorniak's dorm room.

Zorniak testified that she and D.A. had "at least one drink" before arriving at the party and, when they arrived, "fraternity brothers" immediately "handed [them] drinks." Zorniak watched D.A. consume several shots of alcohol from the ice luge in the kitchen before they walked down to the basement, where D.A. consumed "one or two more drinks." Zorniak and D.A. started dancing in the basement with a few other people, which later turned into a large "cluster." Zorniak and another sorority member saw D.A. dancing and "grinding" with a male whom they did not identify—their "bodies were close," and D.A.'s "back was to his front." D.A. "kiss[ed]" the male and continued to drink jungle juice while dancing. D.A., however, could not recall dancing with anyone other than Zorniak.

After twenty or thirty minutes of dancing, Zorniak walked upstairs to use the bathroom on the entry level of the house, leaving D.A. with "sober sisters." According to Zorniak, D.A. was becoming "intoxicated" but appeared "pretty coherent" and was "able to communicate properly." Zorniak "mingl[ed]" with people for several minutes in the basement and "along the way" to the bathroom. When she finally reached the bathroom, however, she saw through a crack that it was occupied by a person with "[a] red sweatshirt and darker skin color." Zorniak could not tell if anyone else was inside. Consequently, she walked to the bathroom on the top floor, talking to other people along the way, and waited in a line for a few minutes. Zorniak admitted that she was away from the basement "for quite a while" and not "on alert" for D.A. after she left her in the basement.

While Zorniak was upstairs, Mehta saw D.A. lying motionless on the floor at the entry-level bathroom door. One of the fraternity members moved D.A. to the couch while Mehta informed the "sorority girls" of D.A.'s condition. Zorniak came downstairs and found D.A.

- 4 -

lying on the couch; it had been approximately thirty minutes since Zorniak left D.A. in the basement. D.A. was vomiting, "incoherent," unable to speak, sweaty, and unresponsive; her breathing was shallow. In addition, her clothes were disheveled: her shorts were unzipped and out of place, her underwear was around her knees, and her bra was twisted. Vomit was on D.A's "clothes, her body, everywhere."

Around 10:30 or 11:00 p.m., Lee and another fraternity member, Christopher Long, carried D.A. to a car so that she could be taken to Zorniak's dorm room. Long, a former Fairfax County EMT, testified that D.A. was "obviously intoxicated." He noted that her eyes would not open, she could not respond to verbal commands, and she could not sit or stand on her own. Long did not call 911, however, because her pulse and breathing were "within normal limits." Lee similarly testified that D.A. could not sit or walk on her own.

After the men carried D.A. from the house, appellant asked Deep Multani, one of the fraternity members, if "everything [was] good." Multani responded, "Yeah, we're straight" or "just figuring out if something happened with this girl."

Zorniak and several sorority members drove D.A. to Zorniak's dorm room. During the drive, D.A. vomited in the car and would not respond to any questions. The group carried D.A. inside the dorm room, set her on the floor, and "aggressively" shook her to "wake her up"; D.A. remained unresponsive.

Lobos, Gill, and appellant packed up the DJ equipment and left the fraternity house around 12:00 or 12:30 a.m. because the party was "dying out." Gill testified that appellant was "pretty intoxicated" and was talking only "a little bit." Appellant walked to the car but "passed out in the back" seat. On the drive home, appellant signaled Gill to "pull over" and vomited on the ground outside.

When D.A. awoke in Zorniack's dorm room the following morning, she reported the incident to her friends, and "took a shower because [she] felt gross." She also used the bathroom and "wiped" herself. D.A. did not initially report the incident to the police or go to the hospital because she "did not want to be humiliated." After being encouraged by her friends, D.A. went to the hospital around 3:00 a.m. the following day, about thirty hours after the incident. At the hospital, D.A. told Detective Jeanette Wagner that the man who assaulted her was "a short male about her height, which would be around 5'3" and either Black or Middle Eastern, some sort of skin tone other than Caucasian, and that he had worn a red hoodie sweatshirt."

Carolyn Abbott, a forensic nurse whom the trial court qualified as an expert in sexual assault examination and evidence recovery, evaluated D.A. at the hospital. D.A. was "coherent," calm, and quiet during the examination but became "tearful" and maintained only "intermittent eye contact" while discussing the assault. D.A. told Abbott that she had "somehow ended up in [a] bathroom" with "a male standing over her and . . . attempting to force his penis into her mouth." D.A. stated that the man had also "bent [her] over the sink" and penetrated her from behind, causing vaginal and anal pain. D.A. admitted to Abbott that she had consumed seven shots of vodka and two mixed drinks, which caused her to become "extremely nauseous" and "vomit[] all over herself."

D.A. believed that "the guys at the frat house put something in [her] drinks." D.A.'s toxicology screen was negative for alcohol, amphetamines, barbitol, benzos, cannabinoids, cocaine, opiates, and PCP. Abbott explained, however, that the hospital's toxicology screen did not test for "any type of date-rape drugs that could have been used." Moreover, Abbott testified that given "the metabolic rate and the time it takes for alcohol and/or drugs to metabolize out of someone's system . . . the majority of the drugs and alcohol" would have "already metabolized out of [D.A.'s] system" in about a twenty-four-hour period. Date-rape drugs, in particular,

"metabolize much quicker out of the body." Abbott also explained that the toxicology screen was affected by the facts that D.A. had eaten, consumed liquids, and vomited in the greater than twenty-four hours that had elapsed between the incident and when she arrived at the hospital.

During the physical examination of D.A., Abbott felt "swelling and tenderness on [D.A.'s] head," "consistent with her . . . hitting her head on the faucet." Abbott also saw three hematomas on D.A.'s labia minora and urinary meatus that had been caused by "blunt force trauma," consistent with "being bent over [a] sink and . . . penetration from behind." Those injuries were consistent with either consensual or nonconsensual sex and were more likely caused by a penis rather than fingers, because "[y]ou don't see that widespread area of the injury with the fingertips." Abbott also saw lacerations on the area surrounding D.A.'s anus, which were still bleeding "a small amount."

Abbott collected swabs from D.A.'s vaginal, anal, and oral areas and sent them to the Virginia Department of Forensic Science for analysis. Doctor Jessica Harris, a forensic scientist whom the trial court qualified as an expert in the field of forensic biology and DNA and body fluid identification and analysis, found two spermatozoa cells on the anorectal swab.[1] Harris compared the spermatozoa cells to DNA taken from a buccal swab of appellant and concluded that he "could not be eliminated as a contributor" to the foreign DNA found on the swab.[2] Harris explained that the probability of randomly selecting an unrelated individual who would be included as a contributor of that DNA was 1 in greater than 7.2 billion.

Harris did not know how the spermatozoa "got to be" on D.A.'s body and admitted that it "possibl[y]" could have been through "transfer." She explained that "primary transfer" occurs

---

[1] Harris did not detect any foreign DNA or bodily fluid on the vaginal and oral swabs.

[2] Harris also compared the spermatozoa to DNA from buccal swabs of two other men who were at the party and matched D.A.'s description of the perpetrator. Both men were eliminated as contributors of the spermatozoa.

whenever a biological material touches and leaves DNA on a surface. "Secondary transfer" occurs when the DNA is transferred from one surface to another through contact. Harris testified that it would be "possible" for spermatozoa on a towel to be transferred to a person who used the towel "to wipe their genital area." She further testified that it would be "possible" for a person to transfer spermatozoa from a towel to their hands or clothing by using the towel.

Before closing argument, the Commonwealth asked the trial court to prohibit appellant from presenting "any argument about transfer DNA occurring . . . because there are no facts in evidence to that effect and that would just invite jury speculation." The Commonwealth maintained that appellant could not argue that "there could have been semen on [a] towel" or "transfer as a possible theory" because "there's been no evidence to that effect." Appellant countered that he should be permitted to argue "alternative theories" and that he did not have to "prove that this was done by contact." He emphasized Harris's testimony that it was "possible" for semen on a towel to be transferred to a person's genitals, hands, or clothing. Appellant wanted to argue to the jury that there was a reasonable doubt concerning how the two spermatozoa were found on D.A. and that they could have been deposited by primary or secondary transfer.

The trial court noted that "what's possible is not what's probable" and "anything is possible." Nevertheless, the court acknowledged that Harris's testimony about DNA transfer was in evidence. Accordingly, the court proposed that appellant could state "precisely what [Harris] said" but could not argue that "there's likely transfer in this case." Appellant rejected that proposal, arguing that "defense theories do not have to be proven, they only have to raise reasonable doubt." He maintained that primary or secondary transfer was a reasonable hypothesis given Harris's testimony.

The trial court ruled that there was no evidence in the record to justify appellant's argument. It held that appellant could "restate precisely what the expert said" and "suggest to the jury that [the testimony] raise[d] [a] reasonable doubt." But the court ruled that appellant could not "go further" and "suggest . . . what has not been in evidence" because "there's no other evidence of transference." The court afforded appellant the opportunity to testify after its ruling, but appellant declined the opportunity.

During closing argument, appellant's counsel argued that "the only evidence connecting [him] to [D.A.]" was "the two broken spermatozoa." Then, without objection from the Commonwealth or interference from the trial court, appellant's counsel contended that Harris did not know, and the evidence did not prove, why the two spermatozoa cells were on D.A.'s person. Thus, he asserted that the Commonwealth's evidence required the jury to "make a leap" that was not justified by the evidence. Appellant reminded the jury of Harris's testimony regarding primary and secondary DNA transfer, including that "it was possible that the DNA . . . could have gotten on that sample based on contact" with something other than a penis. He then concluded that "we don't know" why the spermatozoa were on D.A's person and "that raises a reasonable doubt."

After argument by counsel, the jury convicted appellant of rape, sodomy, and animate object sexual penetration. This appeal follows.

ANALYSIS

A. Sufficiency of the Evidence

Appellant argues that the evidence was insufficient to support his convictions because it failed to prove that D.A. suffered from a "condition" that rendered her "mentally incapacitated" or "physically helpless." Alternatively, he asserts that the evidence failed to prove that he knew or should have known of D.A.'s "condition" at the time of the offenses.

>[W]hen reviewing a challenge to the sufficiency of the evidence to support a conviction, an appellate court considers the evidence in the light most favorable to the Commonwealth, the prevailing party below, and reverses the judgment of the trial court only when its decision is plainly wrong or without evidence to support it.

Jordan v. Commonwealth, 72 Va. App. 1, 5 (2020) (quoting Marshall v. Commonwealth, 69 Va. App. 648, 652-53 (2019)).  "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'"  Secret v. Commonwealth, 296 Va. 204, 228 (2018) (quoting Pijor v. Commonwealth, 294 Va. 502, 512 (2017)) (alteration in original).  Instead, we ask "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. (alteration in original).  "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'"  Chavez v. Commonwealth, 69 Va. App. 149, 161 (2018) (quoting Banks v. Commonwealth, 67 Va. App. 273, 288 (2017)).

Sexual offenses are, "at core, . . . offense[s] against the will and consent of the victim."  Davison v. Commonwealth, 69 Va. App. 321, 330 (2018) (quoting Molina v. Commonwealth, 47 Va. App. 338, 357, aff'd, 272 Va. 666 (2006)).  "[T]he inability to freely exercise will and give consent," however, is not always "a function of force, threat or intimidation by the perpetrator."  Molina, 47 Va. App. at 358; see also Bailey v. Commonwealth, 82 Va. 107, 111 (1886) (holding that "[w]henever there is a carnal connection, and no consent in fact" the wrongful act itself supplies the requisite force that "the law demands as an element of the crime").  Instead, "force, physical helplessness, and mental incapacity present 'several possible sets of underlying facts' that determine whether the victim's will was overcome."  Davison, 69 Va. App. at 330 (quoting Jackson v. Commonwealth, 266 Va. 423, 434-35 (2003)).

To be sure, each of the offenses in this case—rape, forcible sodomy, and animate object sexual penetration—are committed when a defendant accomplishes the respective sexual acts "through the use of the complaining witness's mental incapacity or physical helplessness." Code §§ 18.2-61(A) (rape), 18.2-67.1(A)(2) (forcible sodomy), and 18.2-67.2(A)(2) (object sexual penetration). The Commonwealth need not prove that the victim was *both* mentally incapacitated and physically helpless to sustain convictions for those offenses; either is sufficient by itself. Davison, 69 Va. App. at 330-32. Nevertheless, the record in this case contains overwhelming evidence to support appellant's convictions under either theory.

### 1. Mental Incapacity

Appellant maintains that D.A. was not "mentally incapacitated" because the minimal amount of alcohol she consumed, and her "graphic testimony" regarding the details of the assault, demonstrate that she was not so intoxicated that she did not understand the "nature or consequences of the sexual act[s]." He asserts that the lack of "scientific testimony or evidence particular to" D.A.'s degree of intoxication "undermines the Commonwealth's case," though he admits that scientific evidence is not "a *per se* requirement" to sustain his convictions.

"'Mental incapacity' means that condition of the complaining witness existing at the time of an offense under this article which prevents the complaining witness from understanding the nature or consequences of the sexual act involved in such offense and about which the accused knew or should have known." Code § 18.2-67.10(3). "To 'know, apprehend, or appreciate' the 'nature and consequences' of" a sexual act "can range from a simple understanding of how the act . . . is physically accomplished together with an understanding that a sensation of pleasure may accompany the act, to a thorough and comprehensive understanding of the complex psychological and physiological 'nature' of 'the sexual act' involved." Adkins v. Commonwealth, 20 Va. App. 332, 344-45 (1995). Accordingly, if the victim has "the mental

capacity to have a basic understanding of the elementary and rudimentary nature and consequences" of the sexual act, she is not mentally incapacitated under Code § 18.2-67.10(3). Id. at 345.

Importantly, nothing in that definition requires the complaining witness' mental incapacity to arise from "a permanent condition." Molina, 272 Va. at 673. Rather, "the definition refers to a condition existing 'at the time of an offense' and does not limit its scope to non-transitory conditions." Id. (quoting Code § 18.2-67.10(3)). Thus, it is well-established that a "transitory circumstance such as intoxication" may result in mental incapacity "if the nature and degree of the intoxication has gone beyond the state of merely reduced inhibition and has reached a point where the victim does not understand 'the nature and consequences of the sexual act.'" Id.

In Molina, the Supreme Court held that the evidence was "sufficient to enable a jury to conclude" that a rape victim was mentally incapacitated by a "transitory condition" when, at the time of the offense, she was under the influence of "benzodiazepines and cocaine," had therapeutic levels of lithium in her blood, had a blood alcohol concentration that was "three times the legal limit for the lawful operation of an automobile," and had suffered a seizure. Id. at 674. Although an expert testified that the combination of medication, drugs, and alcohol in the victim's system was "deadly," nothing in our case law or Code § 18.2-67.10(3) requires that a victim's "mental incapacity" be proven with scientific evidence or expert testimony. Id. Instead, it is well-established that whether a victim was mentally incapacitated is a question of fact provable by any competent evidence, and to be determined by the fact-finder after considering all the circumstances. Id. As with any question of fact, we will not reverse the fact-finder's conclusion unless it is plainly wrong or without evidentiary support. Code § 8.01-680.

In this case, Zorniak testified that she and D.A. had "at least one drink" before the party. And Lee stated that D.A. already appeared "partially intoxicated" when she arrived at the fraternity house. Shortly after arriving, D.A. consumed "multiple" shots of hard liquor from the ice luge in the kitchen. She then went to the basement, where she consumed at least a cup of another alcoholic drink. D.A. could not remember whether she had more than one drink in the basement or anything else until she "came to" in the bathroom during the sexual assault, as appellant was orally sodomizing her. During that brief moment of consciousness, D.A. "felt paralyzed," "couldn't move," and had "no control" over her body. When she lost consciousness again a moment later, appellant was penetrating her from behind "with his fingers and with his penis." D.A. had no recollection of lying motionless on the floor at the bathroom door after the assault, of fraternity members carrying her to the couch, or of being transported to Zorniak's dorm room. See Molina, 272 Va. at 674 (holding that the evidence was sufficient to "enable the jury to conclude" that the victim was mentally incapacitated when she was found "unconscious," "unresponsive," and "partially naked" a short time after the assault).

Despite the above evidence, appellant maintains that D.A.'s "graphic testimony" of the sexual assault demonstrated that she retained a "basic understanding of the elementary and rudimentary nature and consequences" of the sexual acts and was, therefore, not mentally incapacitated. See Adkins, 20 Va. App. at 345 (holding that the evidence failed to prove that the victim was mentally incapacitated when she testified that she had "made love" with the defendant and used words like "penis" and "vagina," demonstrating her understanding of the sexual act).

That argument misconceives the nature of appellant's offenses. The Commonwealth was not charged with proving that D.A. was mentally incapacitated during the *entire* sexual assault to sustain his convictions. Rather, the statutes only required the Commonwealth to prove that

appellant accomplished the sexual acts "*through the use* of the complaining witness's mental incapacity or physical helplessness." Code §§ 18.2-61(A), 18.2-67.1(A)(2), and 18.2-67.2(A)(2) (emphasis added). When D.A. "came to" in the bathroom, appellant was *already* orally sodomizing her. And when she lost consciousness again, appellant had shoved her over the sink and was *penetrating* her from behind. Accordingly, at a minimum, the evidence established that D.A. was unconscious for large portions of the assault, save a brief moment, and therefore incapable of understanding the nature of the sexual acts that occurred while she was unconscious. It was through the use of that unconsciousness that appellant orally sodomized D.A. as he held her unresponsive head with his hands. And it was through the use of her continued unconsciousness that he raped and digitally penetrated her before leaving her motionless body on the bathroom floor.

Finally, citing only D.A.'s testimony that she "consumed a few shots and one cup of jungle juice," appellant argues that it "defies common sense" that such little alcohol could cause D.A. "to become so heavily intoxicated" that she experienced anything more than reduced inhibition. The jury, however, was tasked with considering all the evidence when determining D.A.'s level of intoxication and resulting mental capacity, not merely D.A.'s testimony. See Leake v. Commonwealth, 27 Va. App. 101, 109-11 (1998) (holding that circumstantial evidence demonstrated that the defendant was intoxicated and that a chemical test of his blood or breath was not required to convict him of driving while intoxicated). Indeed, a jury's "evaluations of credibility" often involve "choosing between competing accounts offered by different witnesses." Commonwealth v. McNeal, 282 Va. 16, 22 (2011). In addition, the jury is not "required to believe all aspects of the testimony of a witness." Parham v. Commonwealth, 64 Va. App. 560, 565 (2015) (citing Moyer v. Commonwealth, 33 Va. App. 8, 28 (2000) (*en banc*)). "The power to segregate a witness's testimony into the believable, partly believable, or wholly

unbelievable is an exercise of decisional discretion intrinsic to the factfinding task and essential to its proper performance." James v. Commonwealth, 53 Va. App. 671, 679 n.2 (2009) (quoting Harper v. Commonwealth, 49 Va. App. 517, 523 (2007)).

In this case, the jury was not required to disregard the substantial evidence of D.A.'s significant intoxication, paralysis, and ebbing consciousness merely because she testified that she consumed only a few shots and one cup of jungle juice. Indeed, the partygoers who testified universally described D.A. as "incoherent," unable to speak, unresponsive, and disheveled. As fact-finder, the jury was tasked with weighing the competing accounts and crediting the portions of each witness' testimony that it found credible. Towler v. Commonwealth, 59 Va. App. 284, 292 (2011) ("Potential inconsistencies in testimony are resolved by the fact finder."). After doing so in the present case, the jury convicted appellant of the charges. We will not accept appellant's invitation to reweigh the evidence on appeal.

In sum, the evidence, viewed in the light most favorable to the Commonwealth, established that, at the time of the offenses, D.A. was mentally incapacitated due to her heavy intoxication and that appellant accomplished the sexual offenses through the use of the incapacitation.

### 2. Physical Helplessness

Appellant contends that D.A. was not "physically helpless" because the evidence failed to prove that she was "unable to communicate due to unconsciousness or some other condition." He asserts that there was no evidence that D.A. was "unconscious during the assault" and that her statements that she "felt" paralyzed did not establish that she was "unable to communicate." He suggests that, at most, the evidence demonstrated that D.A. was only "slightly intoxicated" before the assault.

"'Physical helplessness' means unconsciousness or any other condition existing at the time of an offense under this article which otherwise rendered the complaining witness physically unable to communicate an unwillingness to act and about which the accused knew or should have known." Code § 18.2-67.10(4). "Unconsciousness is defined as '[n]ot possessed of mind. . . . Insensible to the reception of any stimuli and incapable of performing or experiencing any controlled functions' . . . or '[h]aving lost, esp. temporarily, the capacity of sensory perception.'" Woodward v. Commonwealth, 12 Va. App. 118, 121 (1991) (first quoting Black's Law Dictionary 1367 (5th ed. 1983); and then quoting The American Heritage Dictionary 1318 (2d College ed. 1982)). Like mental incapacity, whether a victim was physically helpless at the time of the sexual offenses is a factual question that will not be reversed on appeal unless it is plainly wrong or without evidentiary support. Id.

In Woodward, we affirmed the defendant's rape conviction when the victim was asleep, and therefore physically helpless, at the time of the sexual intercourse. Id. at 120-21. Notably, we rejected the defendant's argument that the victim was not truly physically helpless because she "remembered 'a presence getting into the bed'" even though she was "asleep." Id. at 121. We held that "sleep is not an all or nothing condition" and that the victim was "in a state of physical helplessness" while asleep. Id. Accordingly, we found that the evidence supported the jury's conclusion that the defendant "had sexual intercourse with the victim *through the use of* her physical helplessness." Id.

As discussed above, the evidence established that D.A. was unconscious and unresponsive before, during, and after the assault due to significant intoxication. Consequently, she had no recollection of the events that happened during those periods of unconsciousness and was, therefore, "unable to communicate an unwillingness to act." Code § 18.2-67.10(4). Indeed, even during her brief moment of consciousness, D.A. "felt paralyzed," "had no control over [her]

- 16 -

body," and was unable to do anything to stop appellant's uninvited sexual acts. At most, she managed to "groan" after she slid off the toilet and landed on the floor. Thus, the evidence demonstrated that appellant seized upon D.A's unconscious, unresponsive, and paralyzed state, when she was unable to resist him verbally or physically, to accomplish each of the sexual acts at issue in this case.

Appellant's reliance on Howard v. Commonwealth, 21 Va. App. 473 (1995), is misplaced. In that case, the complainant drank alcohol at a party and went to the bathroom several times to engage in sexual acts with other partygoers. Id. at 474-75. After leaving the party, the victim began vomiting, saying "it hurts, it hurts," and "passed 'in and out of consciousness.'" Id. at 476. At trial, the victim testified "that when someone attempted to initiate oral sex with her, she bit [his] penis." Id. at 479. She also testified that she had refused to engage in oral sex with the defendant but did not refuse his attempts at sexual intercourse. Id. at 480. Accordingly, the evidence in Howard demonstrated that the victim was not physically helpless under Code § 18.2-67.10(4) because she was able to communicate her consent—or refusal—of particular sexual acts despite her intoxication. Id.

In the present case, however, D.A. was unable to communicate her refusal of the sexual acts because of her intoxication. Accordingly, having reviewed the record, we find that the evidence supports the jury's finding that appellant accomplished the sexual intercourse through the use of D.A.'s physical helplessness.

### 3. Appellant's Knowledge

Appellant alternatively argues that even if D.A. was mentally incapacitated or physically helpless, the evidence failed to prove that he knew or should have known of her condition. He cites to his own intoxication and evidence that D.A. was dancing and behaving "normally"

"moments before the bathroom incident" to suggest that he did not have "sufficient mental capacity himself that he knew or should have known D.A. was incapacitated."

As noted above, the statutory definitions of "mental incapacity" and "physical helplessness" require the condition to be one "about which the accused knew or should have known." Code § 18.2-67.10(3) and (4). Thus, appellant "can avoid liability only if neither . . . [knowledge] element is proved." State v. Olivio, 589 A.2d 597, 607 (N.J. 1991) (applying a similarly worded statute), cited with approval in White v. Commonwealth, 20 Va. App. 332, 343 (1995). The Commonwealth was not required to prove specific intent under those statutes to demonstrate appellant's knowledge. Instead, the statutory requirement, that appellant "knew or should have known" that the victim was mentally incapacitated or physically helpless, requires proof of criminal negligence. Noakes v. Commonwealth, 280 Va. 338, 346 (2010). That is, the Commonwealth had to prove that "the conduct of the [accused] constitutes a great departure from that of a reasonable person . . . which creates a great risk of [harm] to others and where by the application of an objective standard the accused should have realized the risk created by his conduct." Keech v. Commonwealth, 9 Va. App. 272, 280 (1989). Such a determination of criminal negligence is "specific to the circumstances of each case" and therefore "a question for the trier of fact, unless reasonable minds could not differ." Carosi v. Commonwealth, 280 Va. 545, 556 (2010).

Here, the evidence demonstrated that D.A. was unconscious during the assault and had no control of her body. When she briefly regained consciousness, she was on a toilet and appellant's hands were controlling her listless head as he orally sodomized her. When D.A. groaned during the assault, appellant "shush[ed]" for her to be quiet, demonstrating his desire to conceal his wrongdoing from partygoers on the other side of the bathroom door. See Lambert v. Commonwealth, 70 Va. App. 740, 760 (2019) ("[I]t is universally conceded that the fact of an

- 18 -

accused's . . . concealment, assumption of a false name, and related conduct, are admissible as evidence of *consciousness of guilt*, and thus of guilt itself." (emphasis added) (quoting Leonard v. Commonwealth, 39 Va. App. 134, 149 (2002)).

In addition, when D.A. "slid" off the toilet and landed on the floor, appellant's alleged intoxication did not deprive him of the awareness and physical control necessary to lift her motionless body from the floor, return her to the toilet, and continue sodomizing her. Later, appellant lifted D.A. from the toilet, pushed her over the sink, and penetrated her from behind. Indeed, during the entire encounter, D.A. remained motionless and unresponsive as appellant held, lifted, and maneuvered her body. Those circumstances provide overwhelming evidence that appellant either knew or should have known that D.A. was suffering from a condition that rendered her mentally incapacitated or physically helpless at the time of the offenses.

Accordingly, after reviewing the record in the light most favorable to the Commonwealth, we conclude that the evidence was competent, was not inherently incredible, and was sufficient to sustain appellant's convictions for rape, forcible sodomy, and animate object penetration.

## B. Closing Argument

Appellant argues that the trial court abused its discretion by limiting his closing argument regarding Harris's testimony that "the presence of [his] sperm in the anorectal [swab] sample could have been the result of primary or secondary transfer." He contends that he should have been permitted to fully draw the jury's attention to testimony that was properly admitted into evidence, and which "undercut[]" the only evidence linking him to the offenses.

"A trial court has broad discretion in the supervision of opening statements and closing arguments." Jones v. Commonwealth, 71 Va. App. 70, 92 (2019) (quoting O'Dell v. Commonwealth, 234 Va. 672, 703 (1988)). We will not reverse a trial court's ruling limiting an

argument of counsel "unless it affirmatively appears that such discretion has been abused and that the rights of the complaining litigant have been prejudiced." Id. (quoting Canipe v. Commonwealth, 25 Va. App. 629, 639 (1997)). In this case, however, we need not decide whether the trial court erred by limiting appellant's closing argument because, even assuming without deciding it was error, any such error was harmless.[3]

"This Court will not reverse a trial court for errors 'that were harmless to the ultimate result.'" Lienau v. Commonwealth, 69 Va. App. 254, 269 (2018) (quoting Carter v. Commonwealth, 293 Va. 537, 544 (2018)). "It is "'the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless" lest they "retreat from their responsibility, becoming instead impregnable citadels of technicality."'" Id. (quoting Commonwealth v. White, 293 Va. 411, 420 (2017)). "Under the harmless error doctrine, if there was 'a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . for any . . . defect, imperfection, or omission in the record, or for any error committed on the trial.'" Shifflett v. Commonwealth, 289 Va. 10, 12 (2015) (quoting Code § 8.01-678). If "the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand." Lienau, 69 Va. App. at 270 (quoting Clay v. Commonwealth, 262 Va. 253, 260 (2001)). "But if one cannot say, with fair assurance . . . that the judgment was not substantially swayed by the error, . . . the conviction cannot stand." Id.

On appeal, appellant contends that the trial court prevented him from arguing during closing "that reasonable doubt existed as to how the presence of sperm cells were found on D.A., specifically because Harris testified that the sperm cells on the anorectal [swab] sample could

---

[3] "[T]he doctrine of judicial restraint dictates" that appellate courts "decide cases 'on the best and narrowest grounds available.'" Commonwealth v. White, 293 Va. 411, 419 (2017) (quoting Commonwealth v. Swann, 290 Va. 194, 196 (2015)). In this case, "the best and narrowest ground is our conclusion that the alleged trial error . . . was harmless as a matter of law." Id.

have been the result of primary or secondary transfer." Appellant's contrary argument notwithstanding, the record reveals that appellant substantially made that argument to the jury. Specifically, he argued that Harris did not know why appellant's two spermatozoa cells were on D.A.'s person. And he reminded the jury of Harris's testimony regarding DNA transfer and that it was "possible" they "could have gotten on [the] sample *based on contact*." (Emphasis added).

Moreover, appellant's closing argument was not limited to merely "reciting the expert testimony," as he asserts on appeal. Instead, appellant argued, without objection from the Commonwealth or interference from the trial court, that the DNA evidence was "the only evidence connecting [him] to [D.A.]." And he suggested that the lack of an explanation for how the spermatozoa cells were located on D.A. required the jury to "make a leap" that was not justified by the evidence. Then, after emphasizing Harris's testimony that it was possible for the DNA to come from a source other than his penis, appellant asked the jury to conclude that there was a "reasonable doubt."

To the extent that the trial court prohibited appellant from specifically mentioning a towel or some other item as the source of a transfer, such limitation had, at most, only a "slight effect" on the jury. Id. To be sure, there was no evidence introduced even indicating that a towel was in the bathroom at the time of the offenses. Nor was there any evidence that either appellant or D.A. was in the bathroom other than at the time of the offense. Although Harris, who was not aware of the facts underlying this case, testified that it was "possible" for the spermatozoa to be transferred via contact, the record demonstrates that such a possibility was hypothetical and speculative, without a basis in the evidence. See Williams v. Commonwealth, 71 Va. App. 462, 485 (2020) ("[T]he Commonwealth need only exclude reasonable hypotheses of innocence that *flow from the evidence*, not those that spring from the imagination of the defendant." (emphasis added) (quoting Ragland v. Commonwealth, 67 Va. App. 519, 531 (2017))). Instead, the record,

taken as a whole, compels the conclusion that appellant's spermatozoa were transferred onto D.A.'s person during the sexual assault, while he was penetrating her from behind, not from a hypothetical towel or other item that may or may not have been in the bathroom.

Accordingly, given the overwhelming evidence that appellant's spermatozoa were transferred onto D.A.'s person during the sexual assault, and the fact that appellant was substantially able to make the argument in closing that he contends he could not, any error in the trial court's ruling limiting his closing argument was harmless.

## CONCLUSION

For the foregoing reasons, we hold that the evidence was sufficient to sustain appellant's convictions and that the trial court committed no reversible error in limiting appellant's closing argument. Accordingly, appellant's convictions are affirmed.

<u>Affirmed.</u>